Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
Christina Tusan (SBN 192203)
Adrian Barnes (SBN 253131)
Ari Cherniak (SBN 290071)
Polina Brandler (SBN 269086)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

Jason Harrow (SBN 308560)
jason@gerstein-harrow.com
Emily Gerrick (*pro hac vice*)
emily@gerstein-harrow.com
**GERSTEIN HARROW LLP**
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
(323) 744-5293

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANE DOE**, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**AMGEN, INC.**, a Delaware Corporation,<br><br>Defendant. | Case No. 2:23-cv-7448-MCS-SSC<br><br>**FIRST AMENDED COMPLAINT (CLASS ACTION)**<br><br>**Judge: Hon. Mark C. Scarsi**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

## **Preliminary Statement**

1.     Plaintiff Jane Doe, like so many others in California and across the Nation, shared her personal health-related information—including her name, date of birth, sex, and contact information, plus the fact that she was taking a particular pharmaceutical, her self-disclosed medical conditions, and her insurance information —with Defendant Amgen, Inc. Amgen is among the world's largest independent biotechnology companies. Plaintiff was required to provide this information in order to receive financial support to help pay for and use Amgen's blockbuster drug Enbrel (Etanercept).

2.     Unbeknownst to Plaintiff, Amgen was not keeping Plaintiff's and Class Members' sensitive information private. Instead, through Amgen's intentional use of tracking tools on its sign-up website including, but not limited to, the Meta Pixel, offered by Meta Platforms, Inc. (formerly known as Facebook, Inc.), and tracking tools from Google Analytics, Google Double Click, Pulse Point, and AtData/Tower Data (collectively "Advertisers' Tracking Pixels"), Amgen was (and is) sharing medical and personally-identifying information it obtains with these global technology companies.

3.     The information disclosed includes Plaintiff's and Class Members' IP addresses, Facebook and Google personal identifiers, the fact that Plaintiff and Class Members self-identified as having a particular medical condition (e.g., Rheumatoid Arthritis, Plaque Psoriasis, or Ankylosing Spondylitis), the fact that they were seeking financial support from Defendant for a particular drug, the fact that they were patients, and the fact that they were seeking to buy a particular drug (collectively "Confidential Medical Information").

4. Defendant actively chose to share Plaintiff's and Class Members' communications, and their Confidential Medical Information within those communications, when it installed and implemented Advertisers' Tracking Pixels on its website. Those global technology companies to whom Defendant disclosed Plaintiff's and Class Members Confidential Medical Information, in turn, use such private information for whatever purposes those companies wish: to sell and deliver targeted ads for any product under the sun; to improve their service; to send discounts, coupons, or offers for new products of any kind; and more.

5. This behavior violates Amgen's website's users' right to privacy and a host of California statutes designed to protect private medical information from just this sort of unauthorized disclosure. And it violates federal law too. Plaintiff thus brings this suit on behalf of herself and those similarly situated to end this practice and provide her and other class members with the monetary relief to which she and others impacted are entitled.

## Parties

6. Plaintiff Jane Doe is a resident of California. She uses Enbrel and has an Enbrel Co-Pay card. She enrolled in the Enbrel SupportPlus program through Amgen's Enbrel website and has renewed her card on that website every year since 2015. As a result, Plaintiff's Confidential Medical Information has been disclosed by Amgen to Meta, Google and, on information and belief, other unauthorized third parties, without Plaintiff's knowledge, consent, or authorization.

7. Defendant Amgen Inc. is one of the world's largest biopharmaceutical companies and is headquartered in Thousand Oaks, Ventura County, California. Enbrel is a prescription drug used to treat

rheumatoid arthritis and other autoimmune diseases. It is among Amgen's best-selling products.

## Jurisdiction and Venue

8.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this First Amended Complaint alleges a violation of federal law, namely the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*

9.      This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the case involves more than 100 putative class members, the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, and minimal diversity exists because at least one class member and Defendant are citizens of different states.

10.     This Court has personal jurisdiction over the parties because Defendant's principal place of business and headquarters is located in California and it has continuously and systematically conducted business in the State of California. Likewise, Plaintiff is a California resident whose rights were violated in the State of California as a result of her contact with Defendant from and within California.

11.     Venue is proper in this District because Defendant is headquartered and has its principal place of business in Ventura County, California.

## General Allegations

***A.  Throughout the Class Period, Amgen Maintained a Website Through Which Patients Could Learn About Enbrel and Sign up for Enbrel SupportPlus***

12.     Amgen has a monopoly in the United States on Etanercept,

sold under the brand name Enbrel. Enbrel is used to treat rheumatoid arthritis, psoriatic arthritis, plaque psoriasis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis.

13.     Amgen sells Enbrel, in the United States, for $1,762.34 a week without insurance. This amounts to a yearly cost of $91,641.68 for the drug.

14.     Amgen knows that most Class Members cannot afford to pay this amount. To facilitate their access to the drug, Amgen has set up a program called "Enbrel SupportPlus," which helps patients lower their out-of-pocket prescription costs for Enbrel through the use of Amgen's "Enbrel Co-Pay Card."

15.     To access Enbrel Support Plus and the Enbrel Co-Pay Card, Plaintiff and Class Members can go to Amgen's Enbrel website at www.enbrel.com.

16.     For the version of Amgen's website as it appeared in June of 2023—which is functionally substantially similar to versions in prior years— Plaintiff and Class Members are prompted via a drop-down menu titled "select condition" to identify which condition they suffer from, with rheumatoid arthritis, psoriatic arthritis, plaque psoriasis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis as the available options. The screen looked like the below in June of 2023:



Prescription Enbrel® (etanercept) is taken (given) by injection.

17.     Once on the page for their selected condition, Plaintiff and Class Members were and are prompted to click on a "Get Started" button in order to enroll in Enbrel SupportPlus and obtain or renew their Co-Pay Card.

18.     Once Plaintiff and Class Members click the "Get Started" button on the Embrel.com website, they are brought to a page that contains the following text: "Now that you have been prescribed ENBREL, your next step is to enroll in ENBREL® SupportPlus. All of the services and resources available to you through ENBREL® SupportPlus are designed to help patients like you start and stay on your new ENBREL treatment as prescribed. ENBREL® SupportPlus enrollment is an easy way to sign up for resources that can help you establish and maintain your ENBREL treatment routine."

**FIRST AMENDED COMPLAINT**

19.     Also, on the "Get Started" page, in order to proceed to the next page, Plaintiff and Class Members must again select which condition led to their doctor prescribing Enbrel for them.

20.     On the next page, Plaintiff and Class Members are required to describe what type of prescription insurance they have, by selecting from the following options: commercial insurance, government-provided insurance, no insurance, and "I don't know."

21.     Having informed Amgen of their insurance status and situation, Plaintiff and Class Members must select which Enbrel device they use to inject Enbrel, with options for Amgen's "Enbrel Autotouch Connect Autoinjector" with Bluetooth, "Enbrel Mini Cartridge with AutoTouch Autoinjector," "Enbrel SureClick Autoinjector," "Enbrel Prefilled Syringe," and "Enbrel Single-Dose Vial," and an option to select text that states: "I'm not sure which device I'll be using."

22.     On that same page, Plaintiff and Class Members must also indicate whether they are interested in Amgen's "Enbrel Nurse Partners" program. Amgen encourages Plaintiff and Class Members to sign up for this program with the following text: "For additional assistance with establishing your ENBREL treatment routine, turn to one of our *ENBREL Nurse Partners™*, who can provide one-on-one support to help. *ENBREL Nurse Partners™* can provide you help at home, by phone, email, or video chat. *ENBREL Nurse Partners™* are nurses by training, but they are not part of your treatment team or an extension of your doctor's office. *ENBREL Nurse Partners™* do not inject patients with ENBREL. You will be referred to your doctor's office for clinical advice."

23.     Once Plaintiff and Class Members select which device they use to inject Enbrel and select whether or not they would like to enroll in

the Enbrel Nurse Partners program, Plaintiff and Class Members can click through to the next page, which contains a list of "resources" including a guide, a mobile app that can help you track your injections, and a symptom Amgen's "STATWISE Symptom Tracker." They can then click a button with the text "Continue enrollment."

24.     On the enrollment page, Plaintiff and Class Members are required to share their names, addresses, dates of birth, genders, email addresses, and phone numbers.

25.     After filling out the required identifying information and contact information on Amgen's website, Plaintiff and Class Members are required to agree to "Amgen's Patient Authorization."

26.     In the text of Amgen's Patient Authorization agreement, Amgen requires Plaintiff and Class Members to authorize Amgen to use and disclose their personal information, including their personal health information, only for the following purposes:

> "To operate, administer, enroll me in, and/or continue my participation in Amgen's ENBREL® SupportPlus program or any other Amgen-affiliated patient support services and activities related to my condition or treatment (for example, co-pay card programs, reimbursement assistance programs, drug coverage verification, nurse educator services, adherence program and disease management support);
>
> To contact, with my permission, my doctor and the rest of my health care team and share with them my health information that may be useful for my care;
>
> **To provide me with informational and promotional materials relating to Amgen products and services, and/or my condition or treatment**; and/or

To improve, develop, and evaluate products, services, materials and programs related to my condition or treatment."

27.     Amgen assures Plaintiff and Class Members in this agreement, which Plaintiff and Class Members are required to sign up for on its website in order to get massive discounts on medication they need, that their information will not be used for any other purposes.

28.     On information and belief, the website sign-up process described above was the same or substantially similar in all material respects for several years prior to and including July of 2023. As of the date of this Amended Complaint, Amgen appears to have made cosmetic changes to the website sign-up process such that it may differ slightly from that described here, but those differences do not materially affect the process by which Amgen disclosed, released, or permitted the interception of Plaintiff's and Class Members' Confidential Medical Information, or the nature and substance of the Confidential Medical Information that was disclosed, released, or intercepted.

29.     Amgen maintains a re-enrollment website at https://www.enbrel.com/en/patient-resources/ongoing-support (and perhaps at other URLs) where Plaintiff and Class Members can "continue in the ENBREL Co-Pay Program" by going on a website to verify their information and continue to receive a Co-Pay card. The re-enrollment process involves Plaintiff and Class Members going to this website and inputting certain information, including date of birth, Member ID, and insurance information. They are then asked to verify and input additional information, including their continued use of the Enbrel medication.

## B. Amgen Secretly Disclosed Patients' Confidential Medical Information to Third Parties, Including Meta, Google Double Click, Google, Pulse Point, and AtData/Tower Data

30.     Completely unbeknownst to Plaintiff and other Class Members, Amgen, using Advertisers' Tracking Pixels that it installed on its website, has disclosed to, and allowed for the interception by, unauthorized third parties including at least Meta, Google Double Click, Google, Pulse Point, and AtData/Tower Data (collectively "Advertising Tracking Companies") some of the Confidential Medical Information that Plaintiff and other Class Members communicated to Defendant through Defendant's website.

31.     As the FTC has stated, companies who use pixels, like the ones used by Defendant in this case, have numerous options to monetize their use of these pixels.  According to the FTC:

> Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[1]

32.     On information and belief, Defendant has disclosed and aided and abetted Advertising Tracking Companies in intercepting some of the Confidential Medical Information that Plaintiff and other Class Members communicated to Defendant through Defendant's website in

---

[1] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money". PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money).

order to benefit itself by permitting Defendant to improve its marketing, advertising, and other promotional and sales efforts.

33.     The data that Advertising Tracking Companies obtain from users of Amgen's website, including Plaintiff and Class Members, is used for a variety of purposes by those Companies. It is not limited to use by Amgen and its contractors and business partners merely for "informational and promotional materials related to Amgen products and services, and/or [a user's] condition or treatment," or "to improve, develop, and evaluate products, services, materials and programs related to [a user's] condition or treatment."

34.     Amgen collects and shares Plaintiff's and Class Members' information both at the initial enrollment process and then again at re-enrollment, as the pages on Amgen's website associated with both of these processes have the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels.

35.     As soon as Plaintiff or a Class Member visits Amgen's website and either accepts or declines cookies, that information, as well as the fact that they have visited the Enbrel website, is disclosed and transmitted to and intercepted by Meta, Google, and other Advertising Tracking Companies via, respectively, the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels.

36.     Then, once Plaintiff and Class Members select their medical condition (before proceeding to the enrollment screen on the website) Amgen discloses the condition selected to Meta, Google, and other Advertising Tracking Companies via, respectively, the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels.

37.     Once Plaintiff and Class Members begin the enrollment

process, Amgen sends further Confidential Medical Information to, at least, Meta and Google through the Meta Pixel and Google Tracking Pixels including information relating to their health conditions and prescriptions for Enbrel.

38. When Plaintiff and Class Members complete the enrollment process, Amgen sends more of their information to Advertising Tracking Companies, including information relating to their successful enrollment for the Enbrel SupportPlus program and the Enbrel Co-Pay Card.

39. Amgen also discloses to and allows for the interception of relevant information by at least Google and Meta during the re-enrollment processing, including personal information, like their date of birth, their Confidential Medical Information, and their successful re-enrollment in a program for users of the drug Enbrel.

40. Thus, Amgen discloses to Advertising Tracking Companies, including at least Meta and Google, and aids those Companies in the interception of, personal information about Plaintiff and Class Members, including personal health information such as the fact that they are patients who are purchasing a specific prescription medication to treat a particular medical condition, alongside information that allows, at least, Meta and Google to identify any of the Plaintiff and Class Members who also have Meta and Google accounts that are connected to them.

41. Amgen purposefully configured at least the Meta Pixel and Google Tracking Pixels to disclose not only the default information collected by those Advertisers' Tracking Pixels', but also additional confidential health information—including patient status, specific

medications, medical conditions—as described above.

**C. Advertising Tracking Companies' Tracking Tools that Defendant Installed on Its Website to Allow them to Intercept and to Disclose Plaintiff's and Class Members' Confidential Medical Information**

**1. Amgen Disclosed Plaintiff's and Class Member's Confidential Medical Information to Meta in Exchange for Improved Advertising Capabilities**

*a. Meta's Advertising Business*

42.     Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company and is ranked number 71 on the list of Fortune 500 Companies. Meta reported having 2.04 billion daily active users as of March 2023[2] and reported $116.61 billion in revenue in fiscal year 2022.[3]

43.     Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion, and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[4] In its 10k filing covering the fiscal year 2018, Facebook

[2] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf
[3] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf.
[4] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm.

similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[5]

44.    Meta explains that it generates ad revenue by providing advertisers with relevant leads that can be delivered through ad placement in a number of different locations. Meta states that it "provides advertising on its own platforms, such as Facebook and Instagram, as well as through the Facebook Audience Network . . . Ads on our platforms enable marketers to reach people across a range of marketing objectives, such as generating leads or driving awareness. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[6]

45.    Meta currently, and historically, sells and has sold advertising space by highlighting its ability to target users. In 2019, Facebook stated, "Our ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[7] Facebook has also boasted in a sales pitch for its digital advertising that its advanced targeting is better than the limited options offered by other platforms because "people on Facebook

---

[5] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm
[6] Meta Platforms, Inc., Annual Report 10-K, p. 7, 70 (Feb. 2, 2023).
[7] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

share their true identities, interests, life events and more."[8]

46.     Meta can target users so effectively because it tracks Facebook's users' activity both on and off its site, including through the use of Pixels companies like Defendant voluntarily add to their site. This allows Meta to draw inferences about users beyond what they explicitly disclose on their Facebook accounts. Meta also tracks people who do not have Facebook accounts across the web through its widespread Internet marketing products and source code, including the Meta Pixel.

47.     Meta and Facebook collect and have collected vast amounts of personal data for the purpose of identifying individuals like Plaintiff and Class Members and aggregating their many identifiers—the result of which is the creation of essentially cradle-to-grave profiles of Plaintiff and Class Members.[9]

48.     Facebook and Instagram accounts, unsurprisingly, contain a wealth of personal information about their users, almost always including their names, photographs, and biographical information.

49.     FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019:

---

[8] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_facebook_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS https://www.facebook.com/business/help/1029863103720320?helpref=page_content. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_facebook_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS https://www.facebook.com/business/help/1029863103720320?helpref=page_content.

[9] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019 https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf.

**FIRST AMENDED COMPLAINT**

Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms. . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world.[10]

50.    The Electronic Privacy Information Center also addressed the harm that this type of microtargeted advertising can cause when it stated, "Social media companies—and in particular, Facebook—collect vast quantities of personal data in order to 'microtarget' advertisements to users. This practice, also known as surveillance advertising or behavioral advertising, is deeply harmful to privacy, the flow of information, and the psychological health of social media users."[11]

### b. The Meta Pixel

51.    The "Meta Pixel," which was formerly known as the Facebook Pixel,[12] is a snippet of code that companies can integrate into their website, which allows them to track their website users' activities as those users navigate through the website. It can track, for example, each page an individual visits on the website, what buttons the user

---

[10] *Id.*
[11] Electronic Privacy Information Center, https://epic.org/issues/consumer-privacy/social-media-privacy/.
[12] Facebook first offered its "Facebook Pixel" in 2013.

clicks, as well as specific information she may input into the website.[13]

52.    The Meta Pixel is offered for free to advertisers, like Amgen, to integrate into their websites. Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[14] As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take place on [an advertiser's] website."[15]

53.    Automatic events are a category of actions that the Meta Pixel collects and transmits from the website where it is installed without the advertiser being required to add any additional code.[16] The collection and transmission of automatic events is sufficient for an Advertiser to use "customer lists, website or app traffic, or engagement across Facebook technologies, to create Custom Audiences of people who already know [their] business."[17] Moreover, companies like Amgen are able to use their Custom Audience to create a Lookalike Audience. Facebook "leverages information such as demographics, interests and behaviors from [the advertiser's source Custom Audience] to find new people who share similar qualities." Using a Lookalike Audience allows an advertiser to deliver its advertisements to an "audience of people who are similar to (or 'look like') [its] existing customers."[18]

54.    Companies are also able to select from a set of Standard

---

[13] *See* Meta, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[14] Facebook, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[15] Facebook, About Automatic Events,
https://www.facebook.com/business/help/1292598407460746?id=1205376682832142.
[16] *Id.*
[17] Facebook, About Customer Audiences,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[18] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

events, predefined by Facebook, which can also be collected and transmitted by the Meta Pixel, including, for example, what content a visitor views, subscribes to, or purchases.[19]

55.     As soon as a user takes an action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring. In this manner, the Meta Pixel intercepts actions taken by the user and transmits that information to Meta.

56.     When a user accesses a website hosting a Meta Pixel like Defendant's website, Facebook's software script surreptitiously directs the user's computing device to simultaneously send a separate message to Facebook's servers. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the Meta Pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website. While these transmissions are initiated by Meta, they are facilitated by Defendant based on its installation of the Meta Pixel on its website and its configuration of the Meta Pixel in a manner that allows for Meta to intercept this information. Defendant's installation of the Meta Pixel allows Meta to intercept, obtain and use Plaintiff's and Class Members' Confidential Medication

---

[19] Facebook, Specifications for Meta Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

Information including obtaining a header containing the URL information of what the user has been viewing and requesting from websites online.

57. The Meta Pixel acts as a conduit of information, sending the information it collects to Meta through scripts running in the user's web browser. The information is sent in data packets labeled with personally identifiable information, <u>including the user's IP address.</u>

58. Meta allows those who install the Pixel to select what actions it tracks and shares with Meta. Meta's website states, "When you implement Meta Business Tools, such as installing the code into your websites and/or apps or integrating with applicable APIs, you have choices about how to configure the tools and the data that you wish to share."[20]

59. The range of events that can be tracked by the Meta Pixel is vast. Certain information is automatically shared with Meta including:

a. HTTP headers – "Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website."[21]

b. Pixel-specific Data – which "[i]ncludes Pixel ID and the Facebook

---

[20] Meta Best Practices for privacy and data use for Meta Business Tools, https://www.facebook.com/business/help/363303621411154?id=818859032317965; Meta, How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (after creating a Meta Pixel, "Set up events on your website to measure the actions you care about . . . .").

[21] Meta, Meta for Developers, Meta Pixel, https://developers.facebook.com/docs/meta-pixel.

Cookie";[22] and

c. Button Click Data – which "[i]ncludes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks."[23]

60.     Companies like Amgen can also choose to configure the Meta Pixel to track and share custom information inputted by a website visitor.

61.     Meta has multiple means of associating the data it intercepts through the Meta Pixel with a particular user. As it explains in its guide for developers seeking to install and configure the Meta Pixel, the Pixel uses "Facebook cookies . . . to match your website visitors to their respective Facebook User accounts."[24] Meta also receives each user's IP address and, depending on the website and the configuration of the Meta Pixel, may receive other personal identifiers that permit Meta to associate the actions tracked by the Meta Pixel with a specific individual, even if the individual does not have a Facebook account.

62.     The Meta Pixel permits advertisers like Amgen, to "measure, optimize and build audiences for [their] ad campaigns."[25] It is also represented as a product that can help companies who install the Meta Pixel "make sure your ads are shown to the right people" by allowing them to "find people who have visited a specific page or taken desired actions on your website"; to "drive up more sales"; and to "measure the results of your ads by measuring what happens when

---

[22] *Id.*
[23] *Id.*
[24] Meta, Meta for Developers, Meta Pixel: Get Started, https://developers.facebook.com/docs/meta-pixel/get-started.
[25] Meta, Meta Pixel, https://www.facebook.com/business/tools/meta-pixel.

people see them."[26]

63.     Using the example of automotive ads, Meta claims to advertisers that the "Pixel . . . let[s] Meta know who to deliver your ads to based on the actions they've taken, like viewing a specific car or entering payment information. Without this data, automotive ads would not be able to make good recommendations to the potential customers with high probability to convert."[27]

64.     Meta warns companies (like Amgen) that choose to incorporate the Meta Pixel into their websites that the data sent to Meta from that Pixel can be directly associated with their users' names and identities.[28]

65.     On information and belief, the Meta Pixel is designed for the very purpose of intercepting communications on third-party websites by surreptitiously and contemporaneously redirecting these communications to Meta. This interception, however, could not be accomplished in this case without the aid and assistance of Amgen who facilitated the installation of the Meta Pixel on its website.

66.     Aside from aiding the marketing and advertising efforts of each company that incorporates the Meta Pixel into its website, the Meta Pixel permits Meta to surreptitiously intercept and collect data regarding the actions of each specific user across multiple websites. Meta retains and uses the data it obtains through its Meta Pixel on both users and

---

[26] Meta, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142)
[27] Implement the Meta Pixel and/or mobile SDK for automotive ads
https://www.facebook.com/business/help/1989760861301766?id=378777162599537
[28] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started

non-users in its analytics and advertising services.[29] Facebook explained this practice in its written Congressional testimony when it stated:

> Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. These partners provide information about users' activities off Facebook—including information about a user's device, websites users visit, purchases users make, the ads they see, and how they use their services—whether or not they have a Facebook account or are logged into Facebook. . . . . We also receive information about a user's online and offline actions and purchases from third-party data providers who have the rights to provide us with their information.

67. Facebook further explained how it stores data collected through the pixel:

> Facebook receives log data when websites and advertisers use our technologies such as our social plug-in and the Facebook pixel. The amount of time we retain this information depends on the specific data. For example, logs relating to social plug-ins on third-party websites can be from registered users or from non-registered people without a Facebook account. Logs for social plug-ins visited by users is retained for 90 days before they are aggregated. For non-users, these individual logs are stored for 10 days. **Advertiser data sent to us through the Facebook pixel is retained**

---

[29] Written Facebook Testimony Regarding the April 11, 2018 Hearing titled Facebook: Transparency and Use of Consumer Data. 112-13, 672 (June 29, 2019) https://docs.house.gov/meetings/IF/IF00/20180411/108090/HHRG-115-IF00-Wstate-ZuckerbergM-20180411.pdf; Vox, This is How Facebook collects data on you even if you don't have an account (April 20, 2018)https://www.vox.com/2018/4/20/17254312/facebook-shadow-profiles-data-collection-non-users-mark-zuckerberg; Dell Cameron, Facebook is Dodging Questions About Surveillance of Users Seeking Abortions, Gizmodo (June 15, 2022), https://gizmodo.com/facebook-abortion-surveillance-data-privacy-meta-1849066802.

**for 180 days** (emphasis added).[30]

68.     On information and belief, a leaked 2021 internal document regarding Facebook's practices included admissions that it had little control over where data collected from users goes or what it is used for, describing it like "ink flowing into water." An executive summary in the leaked document explains:

> We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation.

69.     The document adds: "Addressing these challenges will require additional multi-year investment in Ads and our infrastructure teams to gain control over how our systems ingest, process and egest data."[31]

70.     Meta associates the information it obtains via Meta Pixel with other information regarding the user, using additional personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. If the user has a Facebook account, these identifiers include cookies called c_user cookies that allow Meta to link data to a consumer's particular Facebook account and

---

[30] Written Facebook Testimony Regarding the April 11, 2018 Hearing titled Facebook: Transparency and Use of Consumer Data, pp. 112-13, 672 (June 29, 2019) https://docs.house.gov/meetings/IF/IF00/20180411/108090/HHRG-115-IF00-Wstate-ZuckerbergM-20180411.pdf

[31] Vice News, Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document, (April 22, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes; Facebook Data Lineage Internal Document https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document.

include a number of string of numbers that can be easily connected to a user's real name by searching for that user number on Facebook. It also includes a cookie, which is called a _datr cookie that Facebook records and uses to identify a customer's unique web browser from which they are sending the communication; this cookie can be used to identify both non-Facebook users and Facebook users. There are also "xs" cookies associated with a particular browsing session. Facebook also has a cookie, which is called the _fr cookie that is an encrypted combination of the c_user (which identifies the user's Facebook account number) and the _datr cookies, which identify the consumer's web browsers.

71. For both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[32]

72. The Meta Pixel that Amgen installed on its website also automatically captures and discloses the IP address of the user. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the Meta Pixel.

### c. Amgen's Use of the Meta Pixel

73. Amgen embedded the Meta Pixel on and throughout its websites and transmitted Confidential Medical Information shared by

---

[32] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

Plaintiff and Class Members, and their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration.

74. When Plaintiff and Class Members visited Defendant's website at www.enbrel.com, the Meta Pixel automatically caused Plaintiff's or the Class Member's personal identifiers, including IP addresses and the c_user, _fr, _datr, and _fbp cookies, to be transmitted to Meta, attached to the fact that the Plaintiff or the Class Member had visited the website and information regarding certain webpages visited by the individual and information they selected or inputted on those pages. Amgen configured the Meta Pixel to disclose Plaintiff's and Class Members' medical conditions, medications, and status as a patient.

75. The cookies that were transmitted as a result of the Meta Pixel Defendant installed on its website conveyed Plaintiff's and Class Members' Facebook Id number (the c_user cookie) which can be used by Facebook and others to find the user's real name, the specific and unique web browser from which the customer is sending the communication (_datr cookie), and an encrypted combination of the information contained in those two cookies (fr cookie).

76. The Meta Pixel that Defendant placed on its website also automatically captured and disclosed the IP addresses of Plaintiff and other Class Members to Meta.

77. Rather than merely transmit the "automatic events" that the Meta Pixel collects and transmits from a website without the website owner or developer being required to add any additional code, on information and belief, Amgen intentionally configured the Meta Pixel on its website to track, collect, disclose, and allow for the interception of Plaintiff's or Class Members' medical condition selected, that they were

seeking financial assistance to pay for medication for that condition, the type of medication they were seeking to get a discount card for, and that they identified as a patient—which were all entered into or submitted to Defendant's website as Plaintiff and Class Members used Defendant's website to prepare and/or obtain a critical and substantial discount card for their needed medication.

78.     On information and belief, when Plaintiff and Class Members used Defendant's website to obtain a discount card that was needed to save them significant amounts of money on their medication- as well as when they went on Amgen's website for their annual renewal of the discount card, the Meta Pixel on Amgen's website caused the Plaintiff's and Class Member's personal identifiers, including IP addresses and the c_user, fr, and datr cookies, to be disclosed to Meta along with Confidential Medical Information.

79.     Put simply, Amgen disclosed to Meta and allowed Meta to intercept Plaintiff's and Class Members' Confidential Medical Information and their personal identifiers.

80.     On information and belief, Amgen disclosed Plaintiff's and Class Members' Confidential Medical Information to Meta in order to permit Amgen to improve its own marketing and advertising. Thus, Amgen exchanged Plaintiff's and Class Members' Confidential Medical Information for its own marketing and advertising purposes.

**2. Amgen Disclosed Plaintiff's and Class Member's Confidential Medical Information to Google and Google Double Click in Exchange for Improved Advertising Capabilities**

81.     According to the US DOJ, "Google now controls the digital

tool that nearly every major website publisher uses to sell ads on their websites (publisher ad server); it controls the dominant advertiser tool that helps millions of large and small advertisers buy ad inventory (advertiser ad network); and it controls the largest advertising exchange (ad exchange), a technology that runs real-time auctions to match buyers and sellers of online advertising."[33]

82. Google is "one of the wealthiest companies on the planet, with a market value of $1 trillion and annual revenue exceeding $160 billion."[34] Google's global network business also generated approximately $31.7 billion in revenues in 2021.[35]

83. On information and belief, Defendant installed tracking pixels from Google, including adding trackers that allowed it to participate in the Google Marketing Platform, on its website. Defendant, through the installation of Google tracking pixels on its website, aided and abetted Google in intercepting Plaintiff's and Class Members' Confidential Medical Information.

84. Google discussed some of the options that businesses like Defendant could use to track consumers in a 2016 blog where it stated:

> The Google Analytics 360 Suite offers integrations with many third party data providers and platforms. It also plugs right into Google AdWords and DoubleClick Digital Marketing, our core ad technology. That means marketers can turn analytics into action by combining their own data from multiple sources — website data, audience data, and customer data (e.g., CRM) and more

---

[33] Justice Department Sues Google for Monopolizing Digital Advertising Technologies, Jan. 23, 2023, https://www.justice.gov/opa/pr/justice-department-sues-google-monopolizing-digital-advertising-technologies
[34] *Id.*
[35] *Id.*

— and using it to make ads more relevant for people.[36]

85.     On July 24, 2018, Google unified its DoubleClick Advertiser Products and the Google Analytics 360 suite under a single brand called the Google Marketing Platform. Google describes its Marketing Platform as "a unified advertising and analytics platform that enables stronger collaboration for your marketing teams by building on existing integrations between DoubleClick and the Google Analytics 360 Suite."[37]

86.     Google represented that its Google Marketing Platform could help advertisers understand their audiences on a "deeper level" by allowing them to "[i]ntegrate and access your data to gain a more complete view of your customers, and connect your data with Google cross-device and intent signals to identify the most valuable audiences."[38]

87.     Google also offers a program called Google Analytics, which initially was called Urchin in 2005, later called Universal Analytics in 2013, called Global Site Tag in 2017, and called Google Analytics in 2020. Universal Analytics is described as a product that "offered new tracking codes for websites and tools that gave more in-depth information about user behavior. . .  As users began to use 2-3 devices to navigate the web, a key goal of Universal Analytics was tracking the same user across different devices."[39]

---

[36] Double Click Advertisers Blog, https://doubleclick-advertisers.googleblog.com/2016/03/introducing-google-analytics-360-suite.html
[37] Google Support, Introducing Google Marketing Platform, https://support.google.com/campaignmanager/answer/9015629?hl=en&sjid=3897296297295 48039-NA.
[38] Google Support, Introducing Google Marketing Platform, https://support.google.com/campaignmanager/answer/9015629?hl=en&sjid=3897296297295 48039-NA.
[39] History of Google Analytics, February 23, 2032, https://onward.justia.com/history-of-google-analytics/.

88.     Google Double Click also advised advertisers that its Marketing Platform "allows users to configure a separate tracking activity for each event they would like to track."[40]

89.     Google explained that its personalized advertising "is a powerful tool that improves advertising relevance for users and increases ROI for advertisers. Because it works by employing online user data to target users with more relevant advertising content . . ."[41]

90.     Defendant's installation of the Google tracking tools such as Google Analytics, Google Double Click, and Google's Marketing Platform (collectively "Google Tracking Pixels") on its website resulted in it disclosing and allowing these third parties to intercept Plaintiff and Class Members' Confidential Medical Information. On information and belief, Google's Tracking Pixels were installed on Amgen's initial sign-up pages and re-enrollment pages, and collected this confidential information from Plaintiff and Class Members as they were entering that information on Defendant's website upon initial sign up and independently during each annual renewal. As a result, on information and belief, Google received confidential medical information from Amgen both when patients initially signed up for the discount cards as well as during each year they renewed the discount cards.

91.     Thus, on information and belief, when Plaintiff and Class Members used Amgen's website, Google's Tracking Pixels on Amgen's website caused the disclosure and interception of Plaintiff's and Class Members' Confidential Medical Information and their personal

---

[40] Double Click Digital Marketing Suite, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick.
[41] Personalized Advertising, https://support.google.com/adspolicy/answer/143465#sensitive.

identifiers.

92.     Put simply, Amgen disclosed to Google and aided and abetted and assisted it in intercepting Plaintiff's and Class Members' Confidential Medical Information. The information shared included Plaintiff's and Class Members' respective activities on Defendant's website, including confidential personal and medical information that they shared with Amgen in connection with their application for discount cards and annual renewals of those discount cards. Defendant unlawfully shared this information without providing notice to Plaintiff or Class Members and without seeking their consent. Defendant also permitted these third parties that received Plaintiff and Class Members' personal medical information to use and profit from the information for their own business purposes.

**3. Amgen Disclosed Plaintiff's and Class Member's Confidential Medical Information to Additional Third Parties, Including Pulse Point and AtData/Tower Data in Exchange for Improved Advertising Capabilities**

93.     In addition to the Meta Pixel and the Google Tracking Pixels, Defendant has installed, embedded, or otherwise permitted Advertisers' Tracking Pixels from, at least, Pulse Point and AtData/Tower Data on its website www.enbrel.com.

94.     On information and belief, when Plaintiff and Class Members used Amgen's website, these additional Tracking Pixels caused the disclosure and interception of Plaintiff's and Class Members' Confidential Medical Information and their personal identifiers in the same manner as the Meta Pixel and Google Tracking Pixels.

## Plaintiff's Experience with Enbrel.com

95.     Plaintiff Jane Doe was diagnosed with ankylosing spondylitis, a type of arthritis, in 2015. The autoimmune disease impacts her eyes, including her vision, plus her hands and other body parts. Among other treatments, she was prescribed Enbrel, which is a once-weekly shot that provides her with substantial relief. Since 2015, she has used Enbrel weekly to maintain her normal function. Without it, her health would seriously deteriorate; she likely would not be able to see.

96.     Soon after being prescribed this treatment, she learned that it was quite expensive and not covered by the insurance she had through her employer. She switched her insurance coverage to a program that would cover it and help lower the cost.  A pharmacist also told her about the Enbrel SupportPlus program that would provide her with additional money to offset the out-of-pocket cost of Enbrel. This pharmacist gave her a brochure so that she could investigate further.

97.     The brochure took her to a website, www.enbrel.com, operated by Amgen, where she could sign-up for the Enbrel SupportPlus program. She first enrolled in the program in approximately 2015 using the Amgen website. At that time, upon information and belief, at a minimum, Google Tracking Pixels were present on the www.enbrel.com website and were disclosing Confidential Medical Information to unauthorized third parties.

98.     When Plaintiff signed up for the Enbrel SupportPlus program, she shared personal information, including her name and other personal details, her diagnosis, her prescription information, and her doctor.

99.     Upon signing up, Plaintiff received a Co-Pay Card that

provided money each month to defray her out-of-pocket cost of buying Enbrel.

100. She has renewed her membership and Co-Pay Card every year since, typically in October, as it is important to her financial well-being that she receives the additional funds from Amgen to cover the out-of-pocket costs of this pharmaceutical. She uses Google Chrome to access the enbrel.com website.

101. Plaintiff, as is true for other Class Members, is required to re-enroll every year to maintain the significant discount Amgen provides for the Embrel medication that she needs. Plaintiff prefers to re-enroll online. Plaintiff recalls re-enrolling online multiple times, including in 2020, 2021, and 2022, using the Google Chrome browser. During those online re-enrollments, she again shared her personal information and verified her use of the Enbrel drug and her desire to continue participating in the SupportPlus program to receive financial help with paying for the drug. She also recalls that one year she called to complete a portion of the re-enrollment process when her insurance information changed, but believes she still did the bulk of her re-enrollment online that year.

102. Plaintiff has both a Facebook and Gmail account, and has had those accounts for several years, including during the times she has accessed Amgen's website to sign-up for or renew her Co-Pay Card. During all of these online enrollments and re-enrollments, Plaintiff was logged into both Google and Facebook. She uses both her Facebook and Google accounts frequently throughout the day, including for work purposes, and regularly remains logged into those accounts including when she re-rolls.

103.    During the time period when she used the Amgen website to re-enroll, upon information and belief, both the Meta Pixel and Google Tracking Pixels were installed on the website, and they transmitted both personal information and private health information—including information about her medical condition and her participation in a support program for her particular pharmaceutical medication—to third parties including, at least, Meta and Google.

104.    After signing up and renewing her request for a Co-Pay Card on Amgen's website, Plaintiff received internet advertisements for Enbrel.

105.    Through no fault or lack of diligence, Plaintiff did not discover that Amgen had disclosed her private information, including her Confidential Medical Information, to unauthorized third parties, including Meta and Google, until approximately early 2023.

106.    Defendant did not disclose to Plaintiff or Class Members that it was using Advertisers' Tracking Pixels to disclose their Confidential Medical Information to unauthorized third parties, and Plaintiff had no reasonable means of discovering this unauthorized disclosure.

**Plaintiff and Class Members are Harmed by Amgen's Disclosure of Private Medical Information**

107.    It is well-established that there is an economic market for consumers' personal data, including the Confidential Medical Information that was disclosed by Amgen to Meta, Google, and other unauthorized third parties.

108.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals,

and that within that context, "age, gender, and location" information are sold for about "$0.50 per 1,000 people." Emily Steel, et al., *How much is your personal data worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-worth/#axzz3myQiwm6u. This estimate was based upon "industry pricing data viewed by the Financial Times," at the time. *Id*.

109. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name." Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/. That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.

110. In 2021, a report from *Invisibly* found that personal medical information is one of the *most valuable pieces of data* within the data-market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care records sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020." *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY.COM (July 13, 2021),

https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

111. Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000. Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

112. Given the existence of a market for the medical information disclosed by Defendant, Defendant has deprived Plaintiff and Class Members of the economic value of their Confidential Medical Information by disclosing such data without authorization and without providing proper consideration for Plaintiff's and other Class Members' property.

113. On information and belief, Defendant has profited from its practice of disclosing Plaintiff and Class Members' Confidential Medical Information to, and allowing for the interception of that Information by, Advertising Tracking Companies like Meta and Google in exchange for improved marketing capabilities. Amgen realized they could make money from improving their marketing capabilities, but rather than paying for a service, Defendant chose to give Plaintiff and Class Members' valuable confidential data to Meta, Google, and other Advertising Tracking

Companies in exchange for the use of their tracking software.

## **Tolling, Concealment, and Estoppel**

114.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Meta Pixel and Google Tracking Pixels as well as other Advertiser's Tracking Pixels into its website.

115.     The Meta Pixel and Google Tracking Pixels and other Advertiser's Tracking Pixels on Defendant's website were and are entirely invisible to a website visitor.

116.     Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

117.     Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

118.     Defendant had exclusive knowledge that its website incorporated the Meta Pixel, Google Tracking Pixels and other Advertisers' Tracking Pixels and yet failed to disclose to customers, including Plaintiff and Class Members, that as a result of using Defendant's website, Plaintiff's and Class Members' Confidential Medical Information would be disclosed or released to, at least, Meta through the Pixel, to Google through Google Tracking Pixels, and potentially to other unauthorized third parties.

119.     Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' medical information. Accordingly, Defendant is estopped from relying on any statute of limitations.

120.     Moreover, all applicable statutes of limitation have also

been tolled pursuant to the discovery rule.

121.     The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## Class Action Allegations

122.     Plaintiff brings this action, on behalf of herself and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or 23(b)(2).

123.     Plaintiff proposes to certify the following classes:

**The California Class:** All natural persons residing in California who used Defendant's website, www.enbrel.com, and provided Defendant with Confidential Medical Information that was disclosed or transmitted to Meta, Google, or any other unauthorized third party; and

**The Nationwide Class:** All natural persons residing in the United States who used Defendant's website, www.enbrel.com, and provided Defendant with Confidential Medical Information that was disclosed or transmitted to Meta, Google, or any other unauthorized third party.

124.     Excluded from the Classes are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

125.     These classes easily satisfy the requirements under Rule 23 for the certification of a class action, known respectively as numerosity, commonality, typicality, adequacy, predominance, and

superiority. Although ascertainability is not a separate requirement of class actions, this class is in fact easily ascertainable.

126. First, Enbrel is used by hundreds of thousands of patients, many thousands of whom provided Amgen with their medical conditions through the Enbrel.com website. Numerosity is beyond dispute here.

127. Second, common questions of fact and law abound in this matter, including, but not limited to, whether Amgen acted with scienter in this matter and whether the information send to Advertising Tracking Companies was "personally identifiable."

128. Third, Plaintiff's claims are typical of those of the class members: Plaintiff used Defendant's website to sign-up for an Enbrel Co-Pay Card, and then to re-enroll each year to keep the card. In the process, she disclosed her personal medical information at a time when the Amgen website maintained Advertiser's Tracking Pixels to share information with third parties, which mirrors the circumstances of all Class Members.

129. Fourth, Plaintiff will adequately represent the class in this matter because she has no known conflicts of interest with other class members, because her claims are typical of those of the class, and because she will vigorously and diligently prosecute this matter. Plaintiff's choice of class counsel, HammondLaw P.C. and Gerstein Harrow LLP, are all experienced class action practitioners who will adequately protect the interests of absent class members.

130. Fifth, common questions vastly predominate over individual ones in this matter. All class members suffered the exact same privacy violation, and so liability will be determined for each on a wholly class wide basis.

131.     Sixth, a class action is a superior way—indeed the only practical way—to proceed in this matter. There are thousands of patients who use Enbrel and have submitted their personal information to Amgen through the website www.enbrel.com, each with identical claims, and there are no practical obstacles to noticing them, determining whether Amgen violated their privacy rights, and proceeding on their behalf as a class. Forcing each to proceed individually, on the other hand, would be impractical and a severe waste of judicial resources.

132.     Finally, although this is not a standalone requirement, this class is easily ascertainable. Meta and Google maintain records by which they can easily identify which of their users and other tracked individuals used the Enbrel.com website. Through the service of straightforward subpoenas for records, Plaintiff will be able to ascertain the name, tracked contact information, Facebook profile, and Gmail or other email address of each and every member of the class and, therefore, will be able easily to notice them of this action, especially using electronic means of notice.

## Claims for Relief

### Count One: Common Law Invasion of Privacy – Intrusion into Private Matters (On Behalf of Plaintiff and the California Class)

133.     Plaintiff incorporates all prior paragraphs by reference.

134.     Amgen's secret disclosure of Plaintiff's and other California Class Members' personal information and private medical information, including information about their medical conditions, prescriptions, and treatments (collectively, their Confidential Medical Information), constitutes an intentional intrusion upon Plaintiff's and California Class Members' private matters that were intended to stay private from third

parties.

135. Plaintiff and California Class Members had a reasonable expectation of privacy in their Confidential Medical Information. Plaintiff and California Class Members did not consent to, authorize, or have any reason to know about Defendant's intrusion into their privacy at the time it occurred.

136. Defendant's intrusion into Plaintiff's and California Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person and was highly offensive to Plaintiff. Plaintiff and California Class Members reasonably expected that the private medical information they shared, including specific information that they were taking prescription medication for a specific medical condition, would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that medical information is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Confidential Medical Information would be highly offensive to a reasonable person.

137. Plaintiff and California Class Members have been harmed as a result of Defendant's actions, including by, but not limited to, an invasion of their privacy rights.

138. Plaintiff and California Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Defendant as a result of its intrusions into Plaintiff's and California Class Members' private matters.

139. Plaintiff and California Class Members are also entitled to

punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiff's and California Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Amgen from engaging in such conduct in the future.

140. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

141. Plaintiff, on behalf of herself and the California Class, request relief as further described below.

## Count Two: Invasion of Privacy and Violation of California Constitution, Art. 1, § 1 (On Behalf of Plaintiff and the California Class)

142. Plaintiff incorporates all prior paragraphs by reference.

143. The right to privacy is enshrined in the California Constitution. Article 1, Section 1, provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

144. Plaintiff and Class Members did not consent to or authorize Defendant to disclose their Confidential Medical Information to

unauthorized third parties. Indeed, Plaintiff and Class Members had no knowledge that such information was being so disclosed and, consequently, had no opportunity to deny consent or authorization.

145. Plaintiff and California Class Members had a reasonable expectation of privacy in their personal information, identities, and medical information pursuant to Article 1, Section 1, of the California Constitution, social norms, and the expectations of privacy that attach to communications regarding healthcare.

146. Defendant's disclosure of Plaintiff's and California Class Members' Confidential Medical Information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms.

147. Defendant's conduct was highly offensive to Plaintiff and would be highly offensive to a reasonable person because the data disclosed was highly sensitive and personal, as protected by the California Constitution, and Defendant lacked consent or authorization to disclose such information to third parties.

148. Defendant's violation of the privacy rights of thousands of California Class Members, including Plaintiff, without authorization or consent, constitutes an egregious breach of social norms.

149. Plaintiff and California Class Members have sustained damages and will continue to suffer damages as a result of Defendant's invasion of their privacy.

150. Plaintiff and California Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Defendant as a result of its intrusions into Plaintiff

and California Class Members' private matters.

151.    Plaintiff and California Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which were directed at invading Plaintiff's and California Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Defendant from engaging in such conduct in the future.

152.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seek the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

153.    Plaintiff, on behalf of herself and the California Class, seek relief as further described below.

### *Count Three: Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101*
### *(On Behalf of all Plaintiff and the California Class)*

154.    Plaintiff incorporates all prior paragraphs by reference.

155.    Cal. Civ. Code § 56.101(a), the California Confidentiality of Medical Information Act (CIMA) requires that every pharmaceutical company that "creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

156. Section 56.101(a) of CMIA further provides, in pertinent part, that any pharmaceutical company that "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

157. Amgen is, and all relevant times has been, a "pharmaceutical company" that creates, maintains preserves, or stores medical information within the meaning of §§ 56.101(a) and 56.05(m).

158. Plaintiff and California Class Members are "patients" as defined by Cal. Civ. Code § 56.05(l).

159. Defendant failed to maintain, preserve, and store Plaintiff's and Class Members' medical information in a manner that preserves the confidentiality of the information contained therein because Defendant disclosed to, at least, Meta and Google, Plaintiff's and Class Members' Confidential Medical Information, as defined and described in this Complaint, including their identities, health conditions, and prescriptions. Instead, Defendant unlawfully disclosed Plaintiff's and Class Members' Confidential Medical Information, including information sufficient to disclose their efforts to use Embrel to treat a medical condition, something that was highly offensive to Plaintiff.

160. Defendant's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at a minimum, negligent, and violates Civil Code § 56.101(a).

161. Accordingly, pursuant to Cal. Civil Code § 56.36, Plaintiff and California Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be

determined at trial; and (3) statutory damages pursuant to Civil Code § 56.36(c); and (4) reasonable attorneys' fees and the costs of litigation.

162.    Plaintiff, on behalf of herself and the California Class, seeks relief as further described below.

### Count Four: Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.102. (On Behalf of Plaintiff and the California Class)

163.    Plaintiff incorporates all prior paragraphs by reference.

164.    Cal. Civil Code § 56.102(b) provides that "[e]xcept as provided in subdivision (a) or Section 56.10, a pharmaceutical company may not disclose medical information provided to it without first obtaining a valid authorization from the patient."

165.    Cal. Civil Code § 56.102(a) provides:

(a) A pharmaceutical company may not require a patient, as a condition of receiving pharmaceuticals, medications, or prescription drugs, to sign an authorization, release, consent, or waiver that would permit the disclosure of medical information that otherwise may not be disclosed under Section 56.10 or any other provision of law, unless the disclosure is for one of the following purposes:
(1) Enrollment of the patient in a patient assistance program or prescription drug discount program.
(2) Enrollment of the patient in a clinical research project.
(3) Prioritization of distribution to the patient of a prescription medicine in limited supply in the United States.
(4) Response to an inquiry from the patient communicated in writing, by telephone, or by electronic mail.

166.    Cal. Civil Code § 56.10 prohibits "[a] provider of health care, health care service plan, or contractor" from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

167. Amgen disclosed Plaintiff and California Class Members' medical information without first obtaining valid authorizations from Plaintiff or California Class Members when it disclosed to, at least, Meta and Google Plaintiff's and California Class Members' Confidential Medical Information, as described in this Complaint. No statutory exception, either in § 56.102(a), § 56.10, or elsewhere, applies. As a result, Amgen violated Civil Code § 56.102(b).

168. Accordingly, pursuant to Cal. Civil Code § 56.36, Plaintiff and California Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to Civil Code § 56.36(c); and (4) reasonable attorneys' fees and the costs of litigation.

169. Plaintiff, on behalf of herself and the California Class, seeks relief as further described below.

### Count Five: Violation of The Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2510 et seq.

### (On Behalf of Plaintiff and all Nationwide Class Members)

170. Plaintiff incorporates all prior paragraphs by reference.

171. The ECPA, 18 U.S.C. §§ 2510 *et seq*., makes it unlawful for a "person" to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

172. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

173. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication."

18 U.S.C. § 2510(8).

174.     "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

175.     "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

176.     Plaintiff's and Class Members' communications with Amgen through the Enbrel.com website, during which Plaintiff and Class Members communicated Confidential Medical Information with Amgen, were electronic communications within the meaning of the ECPA.

177.     Amgen, Meta, and Google are persons within the meaning of the ECPA as they are corporations.

178.     The Meta Pixel and Google Tracking Pixels are both a "device or apparatus" that is "used to intercept a wire, oral, or electronic communication." 18 U.S.C. 2510(4).

179.     By incorporating the Meta Pixel and Google Tracking Pixels into its website and permitting it to intercept Plaintiff's and Class Members' Confidential Medical Information, Defendant took affirmative and intentional steps to intercept or endeavor to intercept Plaintiff's and Class Members' electronic communications and/or affirmatively procured Meta and Google to intercept or endeavor to intercept Plaintiff's and Nationwide Class Members' electronic communications by placing Advertisers' Tracking Pixels on pages of its website that collected

Plaintiff's and Class Members' Confidential Medical Information, which allowed for those interceptions in violation of the ECPA.

180.    18 U.S.C. § 2511(2)(d) provides a "party exception" to 18 U.S.C. § 2511(1) that does not apply in this case. Section 2511(1) provides: "It shall not be unlawful under this chapter [18 USCS §§ 2510 et seq.] for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.*" (emphasis added).

181.    Neither Plaintiff nor the Class Members consented to Defendant's interception of, or to Defendant's procuring Meta and Google to intercept, their electronic communications with Defendant through Defendant's website.

182.    Defendant does not meet the requirements of the "party exception" to the ECPA because the electronic communications intercepted by Defendant, or which Defendant procured Meta and Google to intercept, were intercepted as part of Defendant's practice of divulging medical information to an unauthorized third party in violation of numerous federal and state laws.

183.    As detailed above, Defendant violated the CMIA and the California Constitution, and committed a tortious invasion of privacy, when it disclosed Plaintiff's and California Class Members' Confidential Medical Information to Meta and Google through the Meta Pixel and Google Tracking Pixels. As detailed below, by those same acts, Defendant

violated the California UCL.

184. As detailed below, Defendant violated the Comprehensive Computer Data Access and Fraud Act, Penal Code § 502. Amgen's violations of this Act constitute crimes punishable by fines and/or imprisonment. Penal Code § 502(d)(3),(4). Additionally, as described below, Amgen committed larceny in violation of Penal Code §§ 484 and 496.

185. Moreover, Defendant violated the federal HIPAA Privacy Rule which regulates the use and disclosure of "protected health information" by "covered entities."

186. Defendant is a "covered entity" within the meaning of 45 C.F.R. § 160.103.

187. "Disclosure" within the meaning of the HIPAA Privacy Rule is defined as "the release, transfer, provision of access to, or divulging in any manner of information outside the entity holding the information." 45 C.F.R. § 160.103.

188. The medical information provided by Plaintiff and Class Members to Amgen when they made vaccination appointments through Amgen's Enbrel.com website, as described above, is protected health information within the meaning of the HIPAA Privacy Rule. 45 C.F.R. § 160.103.

189. As described above, Defendant disclosed Plaintiff's and Class Members' protected health information to Meta and Google through, at least, the Meta Pixel and Google Tracking Pixels incorporated into Defendant's Enbrel.com website. This disclosure was neither permitted nor required within the meaning of 45 C.F.R. § 164.502(a).

190. Thus, Defendant committed a tortious act in violation of

the federal HIPAA Privacy Rule when it disclosed Plaintiff's and Class Members' public health information to, at least, Meta and Google.

191. Moreover, pursuant to 42 U.S.C. § 1320d-6, it is a crime for a "person," such as Defendant, to knowingly disclose "individually identifiable health information" to a third party for "commercial reasons." Thus, Defendant committed criminal acts when it knowingly disclosed Plaintiff's and Class Members' public health information to Meta and Google.

192. Accordingly, Defendant violated the ECPA each time the Meta Pixel and Google Tracking Pixels intercepted Plaintiff's and Class Members' electronic communications through Amgen's www.Enbrel.com website.

193. Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members have been damaged by the interception and disclosure of their electronic communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendant as a result of its violations, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

194. Plaintiff, on behalf of herself and the Nationwide Class, seeks relief as further described below.

### Count Six: Violation of California Invasion of Privacy Act (CIPA), California Penal Code §§ 630, et seq.
### (On Behalf of Plaintiff and the California Class)

195. Plaintiff incorporates all prior paragraphs by reference.

196.     The California Invasion of Privacy Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state." Cal. Penal Code § 630.

197.     Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars

($2,500) . . .”

198.    Defendant is a "person" within the meaning of Cal. Penal Code § 631.

199.    The Meta Pixel, Google Tracking Pixels, other Advertisers' Tracking Pixels present on Defendant's website – www.enbrel.com – and Plaintiff's and California Class Members' browsers, computers, and mobile devices qualify as a "machine, instrument, contrivance or . . . other manner" under this statute.

200.    Plaintiff's and California Class Members' communications of medical information with Defendant on and through Defendant's website were intended to be confined to the parties. Plaintiff and California Class Members were using what they understood to be Defendant's secure website and no indication was given that their Confidential Medical Information would be shared with or viewed by any unauthorized third party. Plaintiff and Class Members did not agree to the disclosure of their information to any third party and the circumstances confirm that Plaintiff and California Class Members desired their communications with Defendant to be confined to the parties thereto.

201.    Defendants had knowledge to a substantial certainty that the installation of Meta's Pixel and Google's Google Tracking Pixels devices would record, read, or learn the content of, confidential communications.

202.    Additionally, as discussed above, the fact that the Meta Pixel and Google Tracking Pixels installed on companies' websites record, read, or learn the content of confidential communications has been clearly publicly disclosed by Google and Meta.

203.    Despite not having any authorization from Plaintiff or other California Class Members, Defendant aided, agreed with, or conspired with, at a minimum, Meta and Google, to permit Meta and Google to intercept these communications and to learn the content of those communications while in transit or in the process of being sent or received.

204.    Defendant, without Plaintiff's and Class Members' authorization and knowledge, installed Advertisers' Tracking Pixels on its website and instantaneously and surreptitiously duplicated Plaintiff's and Class Member's communications, and intercepted and shared them with, at least, Meta and Google. On information and belief, Facebook and Google subsequently improperly viewed or otherwise accessed or used Plaintiff's and Class Members' Confidential Medical Information that was shared and disclosed to them by Defendant.

205.    Defendant's conduct, as described above, violated Penal Code § 631. Under Penal Code § 637.2, Plaintiff and California Class Members are entitled to recover the greater of (1) five thousand dollars ($5,000) per violation; or (2) three times the amount of actual damages according to proof at trial, as well as injunctive or other equitable relief.

206.    Plaintiff and California Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive medical information has been collected, viewed, accessed, stored, and used by Meta and Google, and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and California Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiff and California Class Members seek a permanent injunction under Penal Code § 637.2 enjoining Defendant

from engaging in further conduct in violation of Cal. Penal Code § 630, *et seq.*

207. Plaintiff, on behalf of herself and the California Class, seeks relief as further described below.

### *Count Seven: Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502 (On Behalf of Plaintiff and all California Class Members)*

208. Plaintiff incorporates all prior paragraphs by reference.

209. The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502 ("CDAFA") to "expand the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to . . . computer data and computer systems." The Legislature found and declared "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data," further finding and declaring that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals." Cal. Penal Code § 502(a).

210. Penal Code § 502(c)(6) makes it an offense when a person: "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." Defendant violated § 502(c)(6) when it: (i) assisted Meta, Google, and other third parties in accessing, without permission, Plaintiff's and other California Class Members' computers, mobile phones, tablets, or other devices in order to wrongfully obtain and

use their personal data, including their Confidential Medical Information, in violation of Plaintiff's and other California Class Members' reasonable expectations of privacy in their devices and data, in violation of § 502(c)(1)(B); (ii) assisted Meta, Google, and other third parties in accessing, taking, copying, and using Plaintiff's and other California Class Members' personally identifiable information, including their Confidential Medical Information, in violation of § 502(c)(2).

211.    Penal Code § 502(c)(7) makes it an offense when a person: "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." Defendant violated this section when it incorporated the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels into its website and when it configured the Meta Pixel and other Advertisers' Tracking Pixels to disclose Plaintiff's and other California Class Members' Confidential Medical Information and other personal information to Meta, Google, and other third parties, as described above, thereby causing Meta, Google, and other third parties to access Plaintiff's and other California Class Members' computers and other devices without permission.

212.    Penal Code § 502(c)(13) makes it an offense when a person: "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or public safety infrastructure computer system computer, computer system, or computer network in violation of this section." Defendant violated this section when it incorporated the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels into its website and when it configured the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels to disclose Plaintiff's and other California Class Members'

Confidential Medical Information and other personal information to Meta, Google, and other third parties, as described above, thereby providing or assisting in providing a means for Meta, Google, and other third parties to access Plaintiff's and other California Class Members' computers and other devices without permission.

213. Under § 502(b)(12) of the CDAFA, a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Section 502(c)(8) makes it an offense when a person: "Knowingly introduces any computer contaminant into any computer, computer system, or computer network." Defendant violated § 502(c)(8) by knowingly introducing a computer contaminant into Plaintiff's and other California Class Members' devices when it incorporated the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels into its website, which intercepted, transmitted, and disclosed Plaintiff's and other California Class Members' Confidential Medical Information without permission.

214. Plaintiff and other California Class Members suffered damage and loss as a result of Defendant's conduct. Defendant's practices have deprived Plaintiff and other California Class Members of control over their valuable property (namely, their Confidential Medical Information), the ability to receive compensation for that data, and the ability to withhold their data for sale.

215. In addition, Defendant unjustly profited from disclosing Plaintiff's and other California Class Members' private data to third parties in exchange for improved marketing capabilities. Plaintiff and

other California Class Members have a legal interest in these unjustly earned profits.

216. Plaintiff and other California Class Members seek compensatory damages in accordance with California Penal Code § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

217. Plaintiff and other California Class Members have also suffered irreparable and incalculable harm and injuries from Defendant's violations. The harm will continue unless Defendant is enjoined from further violations of this section. Plaintiff and other California Class Members have no adequate remedy at law.

218. Plaintiff and other California Class Members are entitled to punitive or exemplary damages pursuant to Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Civil Code § 3294. Plaintiff and other California Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

219. Plaintiff, on behalf of herself and all California Class Members, seeks relief as further described below.

### Count Eight: Violation of California Penal Code §§ 484, 496 (Statutory Larceny)

### (On Behalf of Plaintiff and all California Class Members)

220. Plaintiff incorporates all prior paragraphs by reference.

221. Cal. Pen. Code § 496 imposes liability upon:

> "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to

be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained[.]"

222.    Cal. Pen. Code § 484, which defines "theft", states in pertinent part:

"Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

223.    Under California law, Plaintiff's and other California Class Members' private data constitutes property that can be the subject of theft.

224.    Defendant acted in a manner constituting theft by intentionally and surreptitiously stealing Plaintiff's and other California Class Members' Confidential Medical Information through the Meta Pixel, Google Tracking Pixels, and other Advertisers' Tracking Pixels on its website, with the specific intent to deprive Plaintiff and other California Class Members of their property.

225.    Plaintiff and other California Class Members did not consent to any of Defendant's actions in taking Plaintiff's and other California Class Members' private data, including their Confidential

Medical Information.

226.     Pursuant to Cal. Pen. Code § 496(c), Plaintiff and other California Class Members are entitled to treble damages, as well as attorneys' fees and costs, for injuries sustained as a result of Defendant's violations of Cal. Pen. Code § 496(a).

227.     Plaintiff, on behalf of herself and all California Class Members, seeks relief as further described below.

### Count Nine: Violation of California Business & Professions Code §§ 17200 et seq. (UCL)

### (On Behalf of Plaintiff and all California Class Members)

228.     Plaintiff incorporates all prior paragraphs by reference.

229.     The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17204 allows "any person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Injured persons may bring such an action on behalf of themselves and others similarly situated, who are affected by the unlawful, unfair, or fraudulent business practice or practices.

230.     Defendant's acts, omissions, practices, and non-disclosures as alleged herein constituted unlawful, unfair, and fraudulent business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.* (UCL).

231.     Defendant engaged in "unlawful" business acts and practices, as set forth above: in violation of the common law; in violation of the California Constitution; and in violation of California statutes, including the Confidentiality of Medical Information Act, the California Invasion of Privacy Act, the Comprehensive Computer Data Access and

Fraud Act, and Penal Code §§ 484 and 496 (Statutory Larceny).

232.     Plaintiff reserves the right to allege other violations of law committed by Defendant that constitute unlawful business acts or practices within the meaning of the UCL.

233.     Defendant has also engaged in "unfair" business acts and practices. California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data. Defendant violated this strong public policy by, among other things, surreptitiously disclosing, releasing, and otherwise misusing Plaintiff's and Class Members' Confidential Medical Information without consent. Defendant's acts and practices violate the policies underlying the statutes and the article of the California Constitution referenced herein.

234.     Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. Defendant secretly disclosed, released, and otherwise misused Plaintiff's and California Class Members' Confidential Medical Information, with no corresponding benefit to its affected customers. And, because consumers were unaware of Defendant's incorporation of Advertisers' Tracking Pixels into its website and that Defendant would disclose and release their medical information to unauthorized third parties, they could not have avoided the harm.

235.     The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described nondisclosures and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

236.     Plaintiff and California Class Members suffered injury in

fact and lost money or property as a result of Defendant's acts and practices in that a portion of any money Plaintiff and California Class Members paid for Defendant's products went to fulfill Defendant's obligations with respect to the confidentiality and security of Plaintiff's and California Class Members' Confidential Medical Information, and Defendant failed to fulfill those obligations.

237. Plaintiff and California Class Members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, among other things: (i) invasion of privacy; (ii) breach of the confidentiality of their medical information; and/or (iii) deprivation of the value of their medical information for which there is a well-established national and international market.

238. Plaintiff seeks a declaration from the Court that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq.* under the unlawful, unfair, and fraudulent prongs of the UCL.

239. Absent injunctive relief from the Court, Defendant is unlikely to correct its illegal conduct fully. Defendant has not acknowledged its wrongful disclosure and release of Plaintiff's and California Class Members' Confidential Medical Information, it has not announced any changes to its practices regarding its treatment of Plaintiff's and California Class Members' Medical Information, and, on information and belief, it has not removed the offending Advertisers' Tracking Pixels from its website. Plaintiff seeks an order from this Court for herself, the California Class Members, and the general public, requiring Defendant to correct its illegal conduct and requiring Defendant to issue a comprehensive notice to affected consumers.

240.    Plaintiff also seeks restitution on behalf of herself and the California Class.

241.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable laws.

242.    Plaintiff, on behalf of herself and all California Class Members, seeks relief as further described below.

## **Prayer for Relief**

Plaintiff Jane Doe, on behalf of herself and all Class Members, respectfully requests judgment against Defendant as follows:

- Ordering that this action may proceed and be maintained as a class action under Federal Rule 23(b)(3) and/or (b)(2); and defining the Classes as specified above and appointing Plaintiff as Representative of the Classes and her attorneys as Counsel for the Classes;

- Awarding Plaintiff and California Class Members compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution;

- Awarding Plaintiff and California Class Members nominal damages of $1,000 per violation, or actual damages, and

reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.101;

- Awarding Plaintiff and California Class Members nominal damages of $1,000 per violation, or actual damages, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code § 56.102(b);

- Awarding Plaintiff and all Nationwide Class Members appropriate equitable or declaratory relief, the greater of the sum of the actual damages suffered and any profits made by Amgen as a result of its violations, or statutory damages of whichever is the greater of $100 per day per violation or $10,000, and reasonable attorneys' fees and other litigation costs reasonably incurred, for Defendant's violations of the ECPA, 18 U.S.C. §§ 2510 *et seq.*;

- Awarding Plaintiff and California Class Members statutory damages of $5,000 per violation, or three times the amount of actual damages, and injunctive relief for Defendant's violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et seq.*;

- Awarding Plaintiff and California Class Members punitive or exemplary damages, compensatory damages, injunctive relief, and reasonable attorneys' fees and other litigation costs reasonably incurred, for Defendant's violations of the Comprehensive Computer Data Access and Fraud Act (CDAFA), Penal Code § 502;

- Awarding Plaintiff and California Class Members' treble damages, and reasonable attorneys' fees and costs, for Defendant's violations of Penal Code §§ 484 and 496;

- Declaring that Defendant's conduct alleged herein constitutes a violation of Bus. & Prof. Code §§ 17200 *et seq.* under the unlawful, unfair, and fraudulent prongs of the UCL;

- Awarding Plaintiff and California Class Members restitution and injunctive relief for Defendant's violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

- Awarding attorneys' fees and costs as authorized by statute and governing law, including Code of Civil Procedure § 1021.5;

- Awarding pre- and post-judgment interest as provided by law; and

- Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

Further, on behalf of herself and other members of the Classes, Plaintiff hereby demands a jury trial on all issues so triable.

Dated: October 13, 2023                    Respectfully submitted,

*/s/ Julian Hammond*
Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
Christina Tusan(SBN 192203)
ctusan@hammondlawpc.com
Adrian Barnes (SBN 253131)
abarnes@hammondlawpc.com

Ari Cherniak (SBN 290071)
acherniak@hammondlawpc.com
Polina Brandler (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

*/s/ Jason Harrow*
Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

Emily Gerrick
(*pro hac vice*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
emily@gerstein-harrow.com
(202) 670-4809

*Attorneys for Plaintiff*

**FIRST AMENDED COMPLAINT**