Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
Christina Tusan (SBN 192203)
ctusan@hammondlawpc.com
Adrian Barnes (SBN 253131)
Ari Cherniak (SBN 290071)
Polina Brandler (SBN 269086)
**HAMMONDLAW, P.C.**
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 807-1666

Jason Harrow (SBN 308560)
jason@gerstein-harrow.com
Emily Gerrick (*pro hac vice*)
emily@gerstein-harrow.com
**GERSTEIN HARROW LLP**
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
(323) 744-5293

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANE DOE**, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**AMGEN, INC.**, a Delaware Corporation,<br><br>Defendant. | Case No. 2:23-cv-7448-MCS-SSC<br><br>**THIRD AMENDED COMPLAINT (CLASS ACTION)**<br><br>**Judge: Hon. Mark C. Scarsi**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Jane Doe files this Third Amended Complaint with the consent of Defendant, per Rule 15(a)(2), and by leave of Court, as specified in the Court's order of June 5, 2024 (ECF No. 59). A redline version of the Second Amended Complaint showing all additions and deletions of material is attached as an appendix.

## Preliminary Statement

1.     Plaintiff Jane Doe, like so many others in California and across the Nation, shared her personal health-related information—including her name, date of birth, sex, and contact information, plus the fact that she was taking a particular pharmaceutical, her self-disclosed medical conditions, and her insurance information—with Defendant Amgen, Inc. Amgen is among the world's largest independent biotechnology companies. Plaintiff was required to provide this information in order to receive financial support to help pay for and use Amgen's blockbuster drug Enbrel (Etanercept).

2.     Unbeknownst to Plaintiff, Amgen was not keeping Plaintiff's and Class Members' sensitive information private. Instead, through Amgen's intentional use of tracking tools on its sign-up website, including, but not limited to, tracking pixels that Amgen embedded on its website, Amgen sent personally identifiable Confidential Medical Information to third-party companies including Meta Platforms, Inc. (formerly known as Facebook, Inc.), Google, Microsoft, Twitter (now known as X), LiveRamp, and TradeDesk.

3.     Expert analysis shows that the information disclosed by Amgen to third-party companies includes the fact that Plaintiff and Class Members self-identified as having a particular medical condition (e.g., Rheumatoid Arthritis, Plaque Psoriasis, or Ankylosing Spondylitis); the

fact that they were seeking to buy a particular drug; the fact that they were seeking financial support from Defendant for a particular drug; the fact that they enrolled and/or re-enrolled in a financial support program to purchase a particular drug; the fact that they were patients; the type of insurance they use; their search history regarding a particular drug; and more (collectively "Confidential Medical Information"). Expert analysis shows that all of the information sent to the third-party companies was personally identifiable, since it was sent along with IP addresses; identifiers used to match Plaintiff and Class Members to their devices and browsers; Facebook, Google, Microsoft, and Twitter personal identifiers that those companies use to match users to their Facebook, Google, Microsoft, and Twitter accounts, respectively; and other identifiers that are used to match Plaintiff and Class Members with profiles containing their names, addresses, phone numbers, and email addresses.

4. Defendant actively chose to share Plaintiff's and Class Members' personally identifiable Confidential Medical Information when it installed and configured the third-party tracking pixels on its website. The third-party companies to whom Defendant disclosed Plaintiff's and Class Members Confidential Medical Information, in turn, use such private information for whatever purposes those companies wish: to sell and deliver targeted ads for any product under the sun; to improve their service; to send discounts, coupons, or offers for new products of any kind; and more. Companies like Meta, Google, Twitter, Microsoft, LiveRamp, and TradeDesk derive a substantial portion of their revenue from selling highly-refined targeted advertising.

5. Both Expert analysis and research shows that these third-

party companies access and scan the personally identifiable Confidential Medical Information sent to them by Amgen, match it with other information they have about Plaintiffs and Class members in a database, and use the information to build highly-detailed and accurate profiles of Plaintiffs and Class Members. The profiles and information, including the Confidential Medical Information, is used for a variety of purposes, including for highly targeted advertising and to personalize the third-party companies' own products (including by personalizing what appears on Plaintiff's and Class Members' Facebook feeds and Google searches).

6. Amgen's actions violate Plaintiff's and Class Members' right to privacy and a host of California and federal statutes designed to protect private medical information from just this sort of unauthorized disclosure. Plaintiff thus brings this suit on behalf of herself and those similarly situated to end this practice and provide herself and other class members with the monetary relief to which they and others impacted are entitled.

## **Parties**

7. Plaintiff Jane Doe is a resident of California. She uses Enbrel and has an Enbrel Co-Pay Card. She enrolled in the Enbrel SupportPlus program through Amgen's Enbrel website and has renewed her Card on that website every year since 2015. As a result of Defendant's affirmative actions—including the placement and configuration of pixels from Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk on its website that collected and shared personally identifiable Confidential Medical Information with those companies—Doe's Confidential Medical Information has been disclosed by Amgen to third-party companies including Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk

without Plaintiff's knowledge, consent, or authorization, and those third-party companies have accessed, viewed, scanned, and used the information for their own purposes.

8. Defendant Amgen Inc. is one of the world's largest biopharmaceutical companies and is headquartered in Thousand Oaks, Ventura County, California. Enbrel is a prescription drug used to treat rheumatoid arthritis and other autoimmune diseases. It is among Amgen's best-selling products.

## Jurisdiction and Venue

9. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the case involves more than 100 putative class members, the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, and minimal diversity exists because at least one class member and Defendant are citizens of different states.

10. This Court has personal jurisdiction over the parties because Defendant's principal place of business and headquarters is located in California and it has continuously and systematically conducted business in the State of California. Likewise, Plaintiff is a California resident whose rights were violated in the State of California as a result of her contact with Defendant from and within California.

11. Venue is proper in this District because Defendant is headquartered and has its principal place of business in Ventura County, California.

## General Allegations

**A.**     ***Throughout the Class Period, Amgen Maintained a Website Through Which Patients Could Learn About Enbrel and Sign up for the Enbrel Co-Pay Card***

12.     Amgen has a monopoly in the United States on Etanercept, sold under the brand name Enbrel. Enbrel is used to treat rheumatoid arthritis, psoriatic arthritis, plaque psoriasis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis.

13.     Amgen sells Enbrel, in the United States, for $1,762.34 a week without insurance. This amounts to a yearly cost of $91,641.68 for the drug.

14.     Amgen knows that most Class Members cannot afford to pay this amount. To facilitate their access to the drug, Amgen has set up a program called "Enbrel SupportPlus," which helps patients lower their out-of-pocket prescription costs for Enbrel through the use of Amgen's "Enbrel Co-Pay Card."

15.     To access Enbrel Support Plus and the Enbrel Co-Pay Card, Plaintiff and Class Members can go to Amgen's Enbrel website at www.enbrel.com. As described in further detail below, this page—like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment—contained pixels that disclosed personally identifiable Confidential Medical Information to third parties. The custom entries that Amgen configured in the tracking pixels disclose to third parties that the www.enbrel.com website is the Enbrel "Official Patient Site."

16.     When Plaintiff and Class Members begin to enter their Confidential Medical Information through the Enbrel SupportPlus enrollment pages, Amgen assures them in large font that "[t]he

information you provide will be used only to help you in your ENBREL journey. We are committed to protecting your data from third parties."

17.     For the version of Amgen's website as it appeared in June of 2023—which is functionally substantially similar to versions in prior years—Plaintiff and Class Members are prompted via a drop-down menu titled "select condition" to identify which condition they suffer from, with rheumatoid arthritis, psoriatic arthritis, plaque psoriasis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis as the available options. The screen looked like the image below in June of 2023:



18.     Once on the page for their selected condition, Plaintiff and Class Members were and are prompted to click on a "Get Started" button in order to enroll in Enbrel SupportPlus and obtain or renew their Co-

Pay Card. As described in further detail below, this page—like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment—contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties iewed, accessed, scanned, sorted, and used the information for their own purposes. In particular, this page sent to third parties information including but not limited to the page's URL, which includes the person's selected medical condition; a separate entry noting the selected condition; and a separate entry noting that the person visiting the URL is a "patient."

19.  Once Plaintiff and Class Members click the "Get Started" button on the Enbrel.com website, they are brought to a page that contains the following text: "Now that you have been prescribed ENBREL, your next step is to enroll in ENBREL® SupportPlus. All of the services and resources available to you through ENBREL® SupportPlus are designed to help patients like you start and stay on your new ENBREL treatment as prescribed. ENBREL® SupportPlus enrollment is an easy way to sign up for resources that can help you establish and maintain your ENBREL treatment routine."

20.  Also, on the "Get Started" page, in order to proceed to the next page, Plaintiff and Class Members must again select the specific condition that led to their doctor prescribing Enbrel for them. As described in further detail below, this page, like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment, contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties accessed, viewed, scanned, and used the information for their own purposes. In

particular, this page sent to third parties information including but not limited to the Plaintiff's and Class Members' selected condition and the fact that she is enrolling in the Enbrel Support Plus program.

21. Next, Plaintiff and Class Members are required to describe what type of prescription insurance they have, by selecting from the following options: commercial insurance, government-provided insurance, no insurance, and "I don't know." As described in further detail below, this page, like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment, contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties accessed, viewed, scanned, and used the information for their own purposes. In particular, this page sent to third parties information including but not limited to the Plaintiff's and Class Members' insurance information.

22. Having informed Amgen of their insurance status and situation, Plaintiff and Class Members must select which Enbrel device they use to inject Enbrel, with options for Amgen's "Enbrel Autotouch Connect Autoinjector" with Bluetooth, "Enbrel Mini Cartridge with AutoTouch Autoinjector," "Enbrel SureClick Autoinjector," "Enbrel Prefilled Syringe," and "Enbrel Single-Dose Vial," and an option to select text that states: "I'm not sure which device I'll be using." As described in further detail below, this page, like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment, contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties accessed, viewed, scanned, and used the information for their own purposes. In particular, this page sent to third parties information including but not limited to the devices that

Plaintiff and Class Members use to inject Enbrel.

23. On that same page, Plaintiff and Class Members must also indicate whether they are interested in Amgen's "Enbrel Nurse Partners" program. Amgen encourages Plaintiff and Class Members to sign up for this program with the following text: "For additional assistance with establishing your ENBREL treatment routine, turn to one of our *ENBREL Nurse Partners™*, who can provide one-on-one support to help. *ENBREL Nurse Partners™* can provide you help at home, by phone, email, or video chat. *ENBREL Nurse Partners™* are nurses by training, but they are not part of your treatment team or an extension of your doctor's office. *ENBREL Nurse Partners™* do not inject patients with ENBREL. You will be referred to your doctor's office for clinical advice."

24. Once Plaintiff and Class Members select which device they use to inject Enbrel and select whether or not they would like to enroll in the Enbrel Nurse Partners program, Plaintiff and Class Members can click through to the next page, which contains a list of "resources" including a guide, a mobile app that can help you track your injections, and a symptom Amgen's "STATWISE Symptom Tracker." They can then click a button with the text "Continue enrollment." As described in further detail below, this page, like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment, contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties accessed, viewed, scanned, and used the information for their own purposes. In particular, this page sent to third parties information including but not limited to whether the Plaintiff and Class Members enrolled in the Enbrel Nurse Partners program and whether they viewed the described medical "resources."

25. On the enrollment page, Plaintiff and Class Members are required to share their names, addresses, dates of birth, genders, email addresses, and phone numbers.

26. After filling out the required identifying information and contact information on Amgen's website, Plaintiff and Class Members are required to agree to "Amgen's Patient Authorization."

27. In the text of Amgen's Patient Authorization agreement, Amgen requires Plaintiff and Class Members to authorize "Amgen and its contractors and business partners ('Amgen')" to use and disclose their personal information, including their personal health information, exclusively for the following specifically enumerated purposes:

> "To operate, administer, enroll me in, and/or continue my participation in Amgen's ENBREL® SupportPlus program or any other Amgen-affiliated patient support services and activities related to my condition or treatment (for example, co-pay card programs, reimbursement assistance programs, drug coverage verification, nurse educator services, adherence program and disease management support);
>
> To contact, with my permission, my doctor and the rest of my health care team and share with them my health information that may be useful for my care;
>
> To provide me with informational and promotional materials relating to Amgen products and services, and/or my condition or treatment; and/or
>
> To improve, develop, and evaluate products, services, materials and programs related to my condition or treatment."

28. Amgen assures Plaintiff and Class Members in this agreement, which Plaintiff and Class Members are required to sign up

for on its website in order to get massive discounts on medication they need, that their information will not be used for any other purposes. The agreement does not have an expiration date or mention any of the third-party companies to whom Amgen discloses Confidential Medical Information.

29. Once Plaintiff and Class Members complete the enrollment process, they are taken to a new page noting they have successfully enrolled in the Enbrel SupportPlus program for the Enbrel Co-Pay Card. As described in further detail below, this page, like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment, contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties accessed, viewed, scanned, and used the information for their own purposes. In particular, once Plaintiff and Class Members complete the enrollment process, the pixels disclose to third parties the fact that they have successfully enrolled in the Enbrel SupportPlus program for the Enbrel Co-Pay Card, as well as the fact that they completed an "[e]nrollment [f]orm" with the description "Financial Support and Patient Information."

30. On information and belief, the website sign-up process described above was the same or substantially similar in all material respects for several years prior to and including July of 2023. As of the date of this Amended Complaint, Amgen appears to have made cosmetic changes to the website sign-up process such that it may differ slightly from that described here, but those differences do not materially affect the above-described process by which Amgen disclosed, released, or permitted the interception of Plaintiff's and Class Members' Confidential

Medical Information to unauthorized third parties like Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, or the nature and substance of the Confidential Medical Information that was disclosed, released, or intercepted.

31. Amgen also annually requires patients to re-enroll for the Enbrel SupportPlus program and the Enbrel Co-Pay Card through its www.enbrel.com website to enable them to continue to receive their medication at a substantial discount. Specifically, patients can navigate to a page on that website with the URL https://www.enbrel.com/en/patient-resources/ongoing-support to "continue in the ENBREL Co-Pay Program" by going on a website to verify their information and continue to receive a Co-Pay card. The re-enrollment process involves Plaintiff and Class Members going to this website and inputting certain information, including date of birth, Member ID, and insurance information. They are then asked to verify and input additional information, including their patient status and their continued use of the Enbrel medication. As described in further detail below, this page, like all of the www.enbrel.com pages for conditions, enrollment, and re-enrollment, contained pixels that disclosed personally identifiable Confidential Medical Information to third parties, and those third parties accessed, viewed, scanned, and used the information for their own purposes. In particular, the information disclosed from this page included, at minimum, that the Plaintiff and Class Members completed re-enrollment in the Enbrel SupportPlus program, that they were categorized as "patient[s]," that they completed the Co-Pay Card renewal form, and what type of insurance they have.

**B.** *Amgen Secretly Disclosed Patients' Confidential Medical Information to Third Parties, Including Meta, Google, and LiveRamp*

32.     Completely unbeknownst to Plaintiff and other Class Members, Amgen, using third-party tracking pixels that it installed on its website, has disclosed to, and allowed for the interception by, unauthorized third parties of Plaintiff and Class Members' Confidential Medical Information provided to Defendant both upon initial sign up and upon reenrollment. Those third parties accessed, viewed, scanned, and used the information they received from Doe and Class Members from Amgen for their own purposes: the third-party companies scanned the personally identifiable Confidential Medical Information sent to them by Amgen, matched it with other information they had about the patients in a database, and then used the information for a variety of purposes, including for highly targeted advertising and to personalize their own products (such as by personalizing what appears on Plaintiff's and Class Members' Facebook feeds or Google searches).

33.     Plaintiff retained two experienced and qualified experts to analyze Amgen's use of tracking pixels on its www.enbrel.com website.

34.     Analysis by the experts retained by Plaintiff's counsel confirms that Amgen's Enbrel Website that patients use to enroll and re-enroll in the Enbrel SupportPlus program for the Enbrel Co-Pay Card contains multiple tracking pixels that have been configured to gather and disclose personal identifying information and personal health information, including tracking pixels that disclose information to at least Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk when Plaintiff and other Class Members communicated Confidential Medical

Information to Defendant through Defendant's website.

35.    As the FTC has stated, companies who use tracking pixels, like the ones used by Defendant in this case, have numerous options to monetize their use of these pixels.  According to the FTC:

> Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[1]

36.    Defendant has disclosed and aided and abetted third-party companies, including at least Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, in intercepting Confidential Medical Information that Plaintiff and other Class Members communicated to Defendant through Defendant's website in order to benefit itself by permitting Defendant to improve its marketing, advertising, and other promotional and sales efforts.

37.    The data that Amgen discloses to those third-party companies through the tracking pixels, including personally identifiable Confidential Medical Information relating to Plaintiff and Class Members, is used for a variety of purposes by those third-party companies. It is not limited to use by Amgen and its "contractors and business partners" merely for "informational and promotional materials

---

[1] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money". PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money).

related to Amgen products and services, and/or [a user's] condition or treatment," or "to improve, develop, and evaluate products, services, materials and programs related to [a user's] condition or treatment." Instead, as described in further detail below, the third-party companies can use the data for whatever purposes they wish, as those third-party companies warn Amgen. Due to the serious privacy concerns, many of the third-party companies instruct companies like Amgen that use their pixels not to disclose health information; Amgen's disclosure of Plaintiff's and Class Members' personally identifiable Confidential Medical Information therefore violates many of the third-party companies' terms of service for use of their pixels.

38. In fact, the Office for Civil Rights at the U.S. Department of Health and Human Services and the Federal Trade Commission have also warned are "serious privacy and security risks related to the use of online tracking technologies that may be present on [the websites of companies like Amgen that] impermissibly disclos[e] consumers' sensitive personal health information to third parties." See FTC and OCR Letter Re: Use of Online Tracking Technologies (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf. They warn that [r]ecent research, news reports, [Federal Trade Commission] enforcement actions, and an [Office of Civil Rights] bulletin have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics."

39. Expert analysis reveals that Amgen collects and shares Plaintiff's and Class Members' information both at the initial enrollment process and then again at re-enrollment, as the pages on Amgen's website

associated with both of these processes have the tracking pixels from Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk that send Plaintiff's and Class Members' Confidential Medical Information to these third parties.

40. Expert analysis shows that, when Plaintiff or a Class Member visits Amgen's website and either accepts or declines cookies, Amgen immediately begins sending data to third-party companies regardless of whether or not the Plaintiff or Class Member accepted or declined cookies. Amgen begins by disclosing fact that the Plaintiff and Class Members have visited the Enbrel website; that information is disclosed and transmitted to and intercepted by Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk via the third-party tracking pixels installed and configured by Amgen. In addition, expert analysis shows that Amgen sends at least Meta and Google a description of www.enbrel.com as being the "Enbrel . . . Official Patient Site."

41. Next, expert analysis shows that once Plaintiff and Class Members select their medical conditions on the www.enbrel.com homepage and are brought to the webpage for the selected condition as described above, Amgen discloses the condition selected to Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk via the relevant tracking pixels.

42. All of the described third-party tracking pixels disclose the webpage's URL, which include the selected condition. For example, the URL for patients who select rheumatoid arthritis as their condition is "https://www.enbrel.com/en/rheumatoid-arthritis."

43. In addition, expert analysis shows that Amgen has purposefully configured the Google tracking pixels and the Meta Pixel to

send custom notations from this page. For example, Amgen configured the Google tracking pixels to send notations for the "co[n]dition[ ]type," followed by the selected condition, and that the "content[ ]type" is "patient." Amgen configured the Meta Pixel to send a notation with the text "Rheumatoid Arthritis (RA) | Enbrel®️ (etanercept)","meta:description":"Enbrel®️ (etanercept), a prescription medicine for moderate to severe rheumatoid arthritis (RA)."

44. Expert analysis shows that, during the enrollment process, the tracking pixels Amgen embedded on its website send further personally identifiable Confidential Medical Information regarding people who utilized Amgen's website (such as Plaintiff and Class Members) to, at least, Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk through the respective third-party tracking pixels.

45. First, expert analysis shows that Amgen sends to all these third-party companies the URLs of the pages associated with the enrollment process, which convey that the person is enrolling for the Enbrel Co-Pay Card, as well as the fact that the person got to the enrollment page from the page noting the person's selected conditions. For example, for Plaintiff and those Class Members who selected rheumatoid arthritis as their condition before clicking the enrollment button, all the described tracking pixels show that they accessed the Enbrel Co-Pay Card enrollment page with the URL of www.enbrel.com/en/patient-services-and-copay-enrollment" from the Enbrel for Rheumatoid Arthritis Page with the URL of www.enbrel.com/en/rheumatoid-arthritis. Then, when the enrollment process is completed, all the described tracking pixels show that the Plaintiff and Class Members were sent to the page for successful

enrollment with the URL of www.enbrel.com/support/congratulations.

46. In addition, expert analysis shows that both the Meta Pixel and the Google tracking pixels were purposefully configured by Amgen to send additional Confidential Medical Information during the enrollment process.

47. First, as depicted in the below screenshot from one of the retained experts, expert analysis shows that the Google tracking pixels were configured to send notations upon successful enrollment about the "Enrollment Form" patients had submitted, including the fact that the form had been submitted; a form description of "Financial Support and Patient Information;" the medical conditions that were selected on the form (for example, "Moderate to severe rheumatoid arthritis (RA)"); the type of insurance selected on the form that the "content[ ]type" of the form was for "patient[s];" and whether the Plaintiff and Class Members

clicked to enroll in the Nurse Partner support program.

```
dl: https://www.enbrel.com/support
dp: /support
sid: 1707001493
sct: 1
seg: 1
dt: Financial Support and Patient Resources | ENBREL® (etanercept)
en: form_submit
_c: 1
ep.full_page_url: https://www.enbrel.com/support
ep.page_type: support
ep.content_type: patient
ep.site_section: support
ep.form_name: Enrollment Form
ep.condition_type: Moderate to severe rheumatoid arthritis (RA)
ep.flow_type: enroll
ep.insurance_type: Commercial
ep.hcp_representative: No
ep.enbrel_guide:
ep.nurse_partner_support: No
ep.insurance_info: No
```

48. Likewise, expert analysis shows that the Meta Pixel was purposefully configured by Amgen to send to Meta a notation showing that the Plaintiff and Class Members had successfully completed the "purchase" of the Enbrel Co-Pay Card and to show when they added products on the www.enbrel.com enrollment page to their carts. In addition, Amgen added code to the Meta Pixel so that it would send notations to convey events such as "SignUp" and "Co Pay Click to Enroll in ENBREL Support" associated with information identifying those who utilized its website (including Plaintiff and Class Members) to third parties during the enrollment process.

49. Expert analysis shows that Amgen also discloses to and allows for the interception of Plaintiff's and Class Members' Confidential Medical Information by at least Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk during the re-enrollment process.

50. While the experts were unable to delve as deeply into the code for the re-enrollment process without valid login information, they were able to determine that the re-enrollment pages on the www.enbrel.com website contained pixels from at least Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk and that those pixels sent to the respective third-party companies, at minimum, the re-enrollment URLs such as "https://www.enbrel.com/en/patient-resources/ongoing-support."

51. In addition, expert analysis was able to determine that the Google tracking pixels sent additional personally identifiable Confidential Medical Information. In particular, Amgen configured the Google tracking pixels to send to Google the page title of "Ongoing support for ENBREL;" the fact that the re-enrollment form was submitted; the name of the form, "Co-pay Renewal Form;" the content type as "patient;" and the type of insurance selected. Amgen also configured the Google tracking pixels to disclose that the title of the renewal webpage was "Ongoing Support for ENBREL."

52. In addition, expert analysis shows that Amgen has configured the Meta Pixel so that when Plaintiff and Class Members click to begin the re-enrollment process, the pixel sends a notation to Meta for the "Initiate[ ]Checkout" event, along with the URL, indicating to Meta that the Plaintiff and Class Members have successfully enrolled in the program for financial support to fill their Enbrel prescriptions.

53. Expert analysis shows that when the described Confidential

Medical Information about Plaintiff and Class Members is sent to Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, all of the information is personally identifiable by those third parties. All information sent through the pixels is accompanied by the Plaintiff's and Class Members' IP addresses; other device property identifiers that companies use to match activity to particular devices (also known as fingerprinting device information); along with information identifying their particular browsers. In addition, all of the described information that Defendant sent to Facebook, Google, Microsoft, and Twitter is accompanied by personal identifiers that those companies use to match individual users to their Facebook, Google, Microsoft, and Twitter accounts, respectively. For example, based on the configuration of the Meta Pixel, the information sent via the Meta Pixel installed on Amgen's website about Plaintiff and Class Members would have been sent along with a corresponding Facebook ID, also known as the c_user cookie, that is tied to each individual's Facebook account, which includes the person's actual name. In addition, the identifiers Facebook, Microsoft, and Twitter use to match Plaintiff and Class Members to their accounts are sent in plain text, meaning that any person in the world with the identifiers can easily match the user to their Facebook, Microsoft, and Twitter accounts. In addition, the personal identifier used by Microsoft is simply the user's account name, which is often the user's actual name. Finally, all information sent to LiveRamp and TradeDesk by Defendant is accompanied by identifiers that those companies use to match Plaintiff and Class Members to detailed profiles the companies maintain of them, which include information like their names, addresses, dates of birth, and email addresses.

54. Expert testing also confirms that these tracking pixels did, in fact, send information about activity on Amgen's Enbrel website to Meta and Google and that Meta and Google accessed, viewed, scanned, and processed the information. The experts were able to confirm this by reviewing their test accounts' Facebook and Google activity pages used to visit the Amgen's Enbrel website. An example, which shows a disclosure from Meta confirming that Enbrel.com shared information about the expert's visit to their website with Facebook, is set forth below:



55. As this screenshot demonstrates, Meta received data from the Enbrel website, accessed it, viewed it, scanned it, and matched it with the Facebook profile of the expert's test account.

56. One expert noted that after interacting with the www.enbrel.com website to test the tracking pixels embedded on the webpages, his Google test account's activity page indicated that Google was verifying that it knew he had visited the tested webpages from Amgen's website. Likewise, when the expert visited his Facebook account's activity page after visiting Amgen websites with the Meta Pixel embedded, that activity appeared on his Facebook test account's activity page. In addition, his Facebook test account began showing advertisements for products relating to arthritis, which was a medical condition he had selected on Amgen's webpage. Because he used a test

account, this confirmed that the advertisement was shown because of the data disclosed through Amgen's use of pixels on its Enbrel website—indicating that it was not only accessed by third-party companies, but viewed, scanned and used by third parties for their own gain.

57.     Likewise, one expert found that, after interacting with Amgen's www.enbrel.com Enbrel SupportPlus/Co-Pay Card enrollment and re-enrollment pages, his test account received advertisements for health-related products that did not otherwise appear, indicating that his information had been viewed by third parties. To test this, he navigated to two popular websites, www.BBC.com and www.Weather.com, after interacting with the www.enbrel.com website. On the www.BBC.com homepage, he received an advertisement reading "We Believe Health Insurance Should Cover More and Cost Less." This advertisement did not appear when he went to www.BBC.com homepage in "incognito mode," which anonymizes web browsing. He also received a health-based advertisement for help finding a doctor on the www.Weather.com homepage that did not appear when he went to the page in "incognito mode."

58.     Again, because the expert used a test account with no other history excepting the Enbrel site visits and then compared the results to those when using "incognito mode" (no history at all), this confirmed that the advertisement was shown because of the data disclosed through Amgen's use of pixels on its Enbrel website—indicating that the data was not only accessed by third-party companies, but scanned, viewed, and used by third parties for their own gain.

59.     Plaintiff's expert noted that, "[i]n summary, there is evidence that third-party companies use the sensitive patient information they

received from Amgen for targeted advertising."

60. In addition, Plaintiff Doe was able to confirm through her Facebook and Google accounts that Meta and Google received information from Amgen's use of pixels on its Enbrel website, which Meta and Google then accessed, scanned, viewed, and matched with her Facebook and Google profiles.

61. Below is a screenshot from Doe's Google profile activity page:



62. Though Google only shares limited information with its users about the details of what they get from companies that, like Amgen, use its Pixel, even this limited view confirms the expert analysis that Google is receiving information from Amgen about its tracking pixels and that it is accessing, scanning, and matching that information with Doe's Google

account. Furthermore, even the URLs displayed here are enough to verify that Amgen disclosed to Google that Doe signed up to renew a card to receive financial assistance in filling her prescription for Enbrel.

63. A screenshot from Doe's Facebook account activity page showing what Facebook describes as "activity received from enbrel.com" is below:

**Activity received from enbrel.com**

| | |
|---|---|
| ID | 211202142803719 |
| Event | CUSTOM |
| Received on | |
| October 13, 2023 at 8:21 AM | |

| | |
|---|---|
| ID | 211202142803719 |
| Event | CUSTOM |
| Received on | |
| October 13, 2023 at 8:08 AM | |

| | |
|---|---|
| ID | 211202142803719 |
| Event | CUSTOM |
| Received on | |
| September 27, 2023 at 3:58 PM | |

| | |
|---|---|
| ID | 211202142803719 |
| Event | CUSTOM |
| Received on | |
| January 24, 2023 at 10:51 AM | |

64. Again, Meta does not share the specific details of the data received through its pixel from companies like Amgen with its users. However, even this limited view demonstrates that Meta is receiving and viewing information from Amgen about its tracking pixels and that it is

accessing, scanning, and matching that information with Doe's Facebook account. Furthermore, the "custom" notation displayed in the above screenshot confirms that Amgen not only embedded the Meta Pixel on its website to disclose default information about patients who used Enbrel, but also affirmatively configured the pixel to disclose customized information specifically chosen by Amgen.

65. In summary, expert analysis and Plaintiff's own social media accounts show that Amgen discloses to third-party companies, including at least Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, and aids those companies in the interception of, personal information about Plaintiff and Class Members, including Confidential Medical Information--such as the fact that they are patients who are purchasing a specific prescription medication to treat a particular medical condition, alongside information that allows the companies to identify the Plaintiff and Class Members. It also confirms that third parties including Meta and Google in fact received that information, viewed it and matched it to website visitors including Plaintiff.

66. As explained in the foregoing, Plaintiff specifically alleges that Defendant has shared her own personally identifying information and Confidential Medical Information that was provided to Defendant when Plaintiff visited Defendant's website without her authorization with third parties as described above, and that those third parties accessed, scanned, viewed, and used the personally identifiable Confidential Medical Information for their own purposes.

**C.** ***Additional Information About Third-Party Companies' Tracking Tools that Defendant Installed on Its Website to Allow them to Intercept and to Disclose Plaintiff's and Class Members' Confidential Medical Information***

## 1. Amgen Disclosed Plaintiff's and Class Members' Confidential Medical Information to Meta in Exchange for Improved Advertising Capabilities

### a. Meta's Advertising Business

67. Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company and is ranked number 71 on the list of Fortune 500 Companies. Meta reported having 2.04 billion daily active users as of March 2023[2] and reported $116.61 billion in revenue in fiscal year 2022.[3]

68. Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion, and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[4] In its 10k filing covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[5]

69. Meta explains that it generates ad revenue by providing

[2] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf
[3] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf.
[4] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm.
[5] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm

advertisers with relevant leads that can be delivered through ad placement in a number of different locations. Meta states that it "provides advertising on its own platforms, such as Facebook and Instagram, as well as through the Facebook Audience Network . . . Ads on our platforms enable marketers to reach people across a range of marketing objectives, such as generating leads or driving awareness. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[6]

70. Meta currently, and historically, sells and has sold advertising space by highlighting its ability to target users. In 2019, Facebook stated, "Our ads enable marketers to reach people based on a variety of factors including age, gender, location, interests, and behaviors. Marketers purchase ads that can appear in multiple places including on Facebook, Instagram, Messenger, and third-party applications and websites."[7] Facebook has also boasted in a sales pitch for its digital advertising that its advanced targeting is better than the limited options offered by other platforms because "people on Facebook share their true identities, interests, life events and more."[8]

---

[6] Meta Platforms, Inc., Annual Report 10-K, p. 7, 70 (Feb. 2, 2023).
[7] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018. https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm
[8] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_facebook_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS https://www.facebook.com/business/help/1029863103720320?helpref=page_content. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement_on_facebook_7-24-19.pdf (citing to Your Guide to Digital Advertising, FACEBOOK BUSINESS https://www.facebook.com/business/help/1029863103720320?helpref=page_content.

71.  Meta can target users so effectively because it tracks Facebook's users' activity both on and off its site, including through the use of Pixels companies like Defendant voluntarily add to their site. This allows Meta to draw inferences about users beyond what they explicitly disclose on their Facebook accounts. Meta also tracks people who do not have Facebook accounts across the web through its widespread Internet marketing products and source code, including the Meta Pixel.

72.  Meta and Facebook collect and have collected vast amounts of personal data for the purpose of identifying individuals like Plaintiff and Class Members and aggregating their many identifiers—the result of which is the creation of essentially cradle-to-grave profiles of Plaintiff and Class Members.[9]

73.  Facebook and Instagram accounts, unsurprisingly, contain a wealth of personal information about their users, almost always including their names, photographs, and biographical information.

74.  FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019:

> Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms. . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things

---

[9] Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019
https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_s
tatement on facebook_7-24-19.pdf.

like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world.[10]

75. The Electronic Privacy Information Center also addressed the harm that this type of microtargeted advertising can cause when it stated, "Social media companies—and in particular, Facebook—collect vast quantities of personal data in order to 'microtarget' advertisements to users. This practice, also known as surveillance advertising or behavioral advertising, is deeply harmful to privacy, the flow of information, and the psychological health of social media users."[11]

### b. The Meta Pixel

76. The "Meta Pixel," which was formerly known as the Facebook Pixel,[12] is a snippet of code that companies can integrate into their website, which allows them to track their website users' activities as those users navigate through the website. It can track, for example, each page an individual visits on the website, what buttons the user clicks, as well as specific information she may input into the website.[13]

77. The Meta Pixel is offered for free to advertisers, like Amgen, to integrate into their websites. In order to embed the Pixel on their websites, companies follow a number of complex steps, including "[e]nter[ing] a name for your pixel and click[ing] **Create pixel**." Meta, How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376

---

[10] *Id.*
[11] Electronic Privacy Information Center, https://epic.org/issues/consumer-privacy/social-media-privacy/.
[12] Facebook first offered its "Facebook Pixel" in 2013.
[13] *See* Meta, About Meta Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

682832142 (emphasis original).

78. Once installed on a website, "the [P]ixel will log when someone takes an action on [that] website."[14] As Facebook explains, "[t]he Meta Pixel receives information about the actions, or events, that take place on [an advertiser's] website."[15]

79. Companies like Amgen can, and did, configure what information is sent to Meta through the Meta Pixel. In this case, as expert analysis reveals, Amgen configured the Meta Pixel to send both default information and "custom" information (called "events") including Plaintiff's and Class Members' health conditions, patient status, and enrollment in the Enbrel SupportPlus program for the Enbrel Co-Pay Card along with information that personally identified them.

80. Automatic events are a category of actions that the Meta Pixel collects and transmits from the website where it is installed without the advertiser being required to add any additional code.[16] The collection and transmission of automatic events is sufficient for an Advertiser to use "customer lists, website or app traffic, or engagement across Facebook technologies, to create Custom Audiences of people who already know [their] business."[17] Moreover, companies like Amgen are able to use their Custom Audience to create a Lookalike Audience. Facebook "leverages information such as demographics, interests and behaviors from [the advertiser's source Custom Audience] to find new people who share

---

[14] Facebook, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[15] Facebook, About Automatic Events,
https://www.facebook.com/business/help/1292598407460746?id=1205376682832142.
[16] Id.
[17] Facebook, About Customer Audiences,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

similar qualities." Using a Lookalike Audience allows an advertiser to deliver its advertisements to an "audience of people who are similar to (or 'look like') [its] existing customers."[18]

81. Companies are also able to select from a set of Standard events, predefined by Facebook, which can also be collected and transmitted by the Meta Pixel, including, for example, what content a visitor views, subscribes to, or purchases.[19]

82. As soon as a user takes an action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring. In this manner, the Meta Pixel intercepts actions taken by the user and transmits that information to Meta.

83. When a user accesses a website hosting a Meta Pixel like Defendant's website, Facebook's software script surreptitiously directs the user's computing device to simultaneously send a separate message to Facebook's servers. This second transmission, completely invisible and unknown to the user, contains the content of the original request sent to the host website ("GET request"), along with the data that the Meta Pixel was configured to collect ("POST request"). GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting. These transmissions are initiated by Meta code and concurrent with the communications to and from the host website. While these transmissions

---

[18] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[19] Facebook, Specifications for Meta Pixel Standard Events,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

**THIRD AMENDED COMPLAINT**

are initiated by Meta, they are facilitated by Defendant based on its installation of the Meta Pixel on its website and its configuration of the Meta Pixel in a manner that allows for Meta to intercept this information. Defendant's installation of the Meta Pixel allows Meta to intercept, obtain and use Plaintiff's and Class Members' Confidential Medication Information including obtaining a header containing the URL information of what the user has been viewing and requesting from websites online.

84.     The Meta Pixel acts as a conduit of information, sending the information it collects to Meta through scripts running in the user's web browser. The information is sent in data packets labeled with personally identifiable information, including the user's IP address and Facebook ID, also known as a "c_user cookie." As explained above, anyone in the world with this ID can plug it into the www.facebook.com website to pull up the individual's Facebook profile, which nearly always includes the person's name, pictures, and a wealth of other personally identifying details.

85.     Meta allows those who install the Pixel to select what actions it tracks and shares with Meta. Meta's website states, "When you implement Meta Business Tools, such as installing the code into your websites and/or apps or integrating with applicable APIs, you have choices about how to configure the tools and the data that you wish to share."[20]

---

[20] Meta Best Practices for privacy and data use for Meta Business Tools, https://www.facebook.com/business/help/363303621411154?id=818859032317965; Meta, How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (after creating a Meta Pixel, "Set up events on your website to measure the actions you care about . . . .").

86.  Meta explains to companies that the range of events that can be tracked by the Meta Pixel is vast. Certain information is automatically shared with Meta including:

    a.  HTTP headers – "Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website."[21]

    b.  Pixel-specific Data – which "[i]ncludes Pixel ID and the Facebook Cookie [also known as the Facebook ID]";[22] and

    c.  Button Click Data – which "[i]ncludes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks."[23]

87.  Facebook warns developers and those who incorporate the Facebook pixel into their website that the pixel is a personal identifier because it "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook ads Manager . . . "[24]

88.  As noted above, companies like Amgen can also choose to configure the Meta Pixel to track and share custom information inputted by a website visitor. As Meta explains to companies like Amgen that use the Pixel, while "[s]tandard events are actions with predefined names

---

[21] Meta, Meta for Developers, Meta Pixel, https://developers.facebook.com/docs/meta-pixel.
[22] *Id.*
[23] *Id.*
[24] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started (last visited 6/17/2025).

that we recognize and support across ad products," companies can also manually create "custom events" in order to configure the Pixel to collect and share specific information.

89. In this case, expert analysis reveals that Amgen configured the Meta Pixel to collect and share custom information with Meta, including, for example, a description of Enbrel as "a prescription medication for moderate to severe rheumatoid arthritis" that is sent every time a Plaintiff or Class Member selects rheumatoid arthritis as their condition on the "Enbrel . . . Official Patient Site."

90. Meta has multiple means of associating the data it intercepts through the Meta Pixel with a particular user. As it explains in its guide for developers seeking to install and configure the Meta Pixel, the Pixel uses "Facebook cookies . . . to match your website visitors to their respective Facebook User accounts."[25] This is typically referred to as the users' "Facebook IDs," also known as "c_user" cookies. Meta also receives each user's IP address and, depending on the website and the configuration of the Meta Pixel, may receive other personal identifiers that permit Meta to associate the actions tracked by the Meta Pixel with a specific individual, even if the individual does not have a Facebook account. Here, Defendant shared Plaintiff and Class Members' Confidential Medical Information with Meta along with their Facebook IDs, also known as c_user cookies.

91. The Meta Pixel permits advertisers like Amgen who had installed the Meta Pixel, to "measure, optimize and build audiences for

---

[25] Meta, Meta for Developers, Meta Pixel: Get Started, https://developers.facebook.com/docs/meta-pixel/get-started.

[their] ad campaigns."[26] It is also represented as a product that can help companies who install the Meta Pixel "make sure your ads are shown to the right people" by allowing them to "find people who have visited a specific page or taken desired actions on your website"; to "drive up more sales"; and to "measure the results of your ads by measuring what happens when people see them."[27]

92. Using the example of automotive ads, Meta claims to advertisers that the "Pixel . . . let[s] Meta know who to deliver your ads to based on the actions they've taken, like viewing a specific car or entering payment information. Without this data, automotive ads would not be able to make good recommendations to the potential customers with high probability to convert."[28]

93. Meta warns companies (like Amgen) that choose to incorporate the Meta Pixel into their websites that the data sent to Meta from that Pixel can be directly associated with their users' names and identities.[29]

94. Meta warns companies not to use the Meta Pixel "to share prohibited information about people, which is information defined as sensitive under applicable laws, regulations or industry guidelines, or otherwise not allowed under our terms and policies."[30] Meta also warns that doing so "is a violation of the Meta Business Tools terms."[31] Those

[26] Meta, Meta Pixel, https://www.facebook.com/business/tools/meta-pixel.
[27] Meta, About Meta Pixel,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142)
[28] Implement the Meta Pixel and/or mobile SDK for automotive ads
https://www.facebook.com/business/help/1989760861301766?id=378777162599537
[29] Facebook, Get Started, https://developers.facebook.com/docs/meta-pixel/get-started
[30] Facebook, About standard and custom website events,
https://www.facebook.com/business/
help/964258670337005?id=1205376682832142.
[31] *Id.*

terms of use make clear that Meta receives data as a result of companies' use of the Meta Pixel.

95.    The terms provide that "[b]y clicking 'Accept' or using any of the Meta Business Tools [including the Meta Pixel], you agree to" a number of provisions, including that:

- "[Meta] may use Business Tool [including Meta Pixel] Data" for various purposes;

- "You represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool [including the Meta Pixel] Data;" and

- "You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool [including the Meta Pixel] Data collection, sharing and usage that includes, at a minimum . . . a clear and prominent notice on each web page where our pixels are used that links to a clear explanation . . . that third parties, including Meta, may use cookies . . . to collect or receive information from your websites."

96.    As the expert analysis described above shows, Amgen embedded and configured the Meta Pixel in such a way as to disclose personally identifiable Confidential Medical Information to Meta. Amgen did this without providing the notice to patients described in Meta's terms and without obtaining permission required by law. Thus, Amgen

violated Meta's terms of use when it configured the Meta Pixel to disclose private health information through the Meta Pixel.

97. As Meta warns companies like Amgen, in addition to aiding the marketing and advertising efforts of each company that incorporates the Meta Pixel into its website, the Meta Pixel automatically intercepts and discloses data regarding the actions of each specific user across multiple websites using the Meta Pixel. Meta retains, views, scans, accesses, and uses the data it obtains through its Meta Pixel on both users and non-users in its analytics and advertising services.[32] Facebook explained this practice in its written Congressional testimony when it stated:

> Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. These partners provide information about users' activities off Facebook—including information about a user's device, websites users visit, purchases users make, the ads they see, and how they use their services—whether or not they have a Facebook account or are logged into Facebook. . . . . We also receive information about a user's online and offline actions and purchases from third-party data providers who have the rights to provide us with their information.

98. Facebook further explained how it stores data collected

---

[32] Written Facebook Testimony Regarding the April 11, 2018 Hearing titled Facebook: Transparency and Use of Consumer Data. 112-13, 672 (June 29, 2019) https://docs.house.gov/meetings/IF/IF00/20180411/108090/HHRG-115-IF00-Wstate-ZuckerbergM-20180411.pdf; Vox, This is How Facebook collects data on you even if you don't have an account (April 20, 2018)https://www.vox.com/2018/4/20/17254312/facebook-shadow-profiles-data-collection-non-users-mark-zuckerberg; Dell Cameron, Facebook is Dodging Questions About Surveillance of Users Seeking Abortions, Gizmodo (June 15, 2022), https://gizmodo.com/facebook-abortion-surveillance-data-privacy-meta-1849066802.

---

**THIRD AMENDED COMPLAINT**

through the pixel:

> Facebook receives log data when websites and advertisers use our technologies such as our social plug-in and the Facebook pixel. The amount of time we retain this information depends on the specific data. For example, logs relating to social plug-ins on third-party websites can be from registered users or from non-registered people without a Facebook account. Logs for social plug-ins visited by users is retained for 90 days before they are aggregated. For non-users, these individual logs are stored for 10 days. **Advertiser data sent to us through the Facebook pixel is retained for 180 days** (emphasis added).[33]

99. On information and belief, a leaked 2021 internal document regarding Facebook's practices included admissions that it had little control over where data collected from users goes or what it is used for, describing it like "ink flowing into water." An executive summary in the leaked document explains:

> We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation.

100. The document adds: "Addressing these challenges will require additional multi-year investment in Ads and our infrastructure teams to

---

[33] Written Facebook Testimony Regarding the April 11, 2018 Hearing titled Facebook: Transparency and Use of Consumer Data, pp. 112-13, 672 (June 29, 2019) https://docs.house.gov/meetings/IF/IF00/20180411/108090/HHRG-115-IF00-Wstate-ZuckerbergM-20180411.pdf

gain control over how our systems ingest, process and egest data."[34]

101. Meta associates the information it obtains via Meta Pixel with other information regarding the user, using additional personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect. As mentioned above, if the user has a Facebook account, these identifiers include the person's Facebook ID, also called "c_user cookies" that allow Meta, and anyone else with the Facebook ID, to link data to a consumer's particular Facebook account and include a number of string of numbers that can be easily connected to a user's real name by searching for that user number on Facebook.

102. These identifiers also include a cookie, which is called a _datr cookie that Facebook records and uses to identify a customer's unique web browser from which they are sending the communication; this cookie can be used to identify both non-Facebook users and Facebook users. There are also "xs" cookies associated with a particular browsing session. Facebook also has a cookie, which is called the _fr cookie that is an encrypted combination of the c_user cookie (which, again, identifies the user's Facebook account number) and the _datr cookie, which identifies the consumer's web browsers.

103. Meta uses the "datr" and "fr" cookies, which tie individuals to their browser, to track both Facebook account-holders and users who do not have a Facebook account.[35]

---

[34] Vice News, Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document, (April 22, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes; Facebook Data Lineage Internal Document https://www.documentcloud.org/documents/21716382-facebook-data-lineage-internal-document.

[35] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

104. In addition to the user's Facebook ID and cookies tying the user to their browser, the Meta Pixel that Amgen installed on its website also automatically captured and disclosed the IP address of the user. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications. Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses. Thus, IP addresses are personally identifiable, particularly in combination with other information disclosed through the Meta Pixel.

### c. Amgen's Use of the Meta Pixel

105. Amgen intentionally embedded the Meta Pixel on and throughout its websites and transmitted Confidential Medical Information shared by Plaintiff and Class Members, and their personal identifiers, without their consent, to Meta in accordance with the Meta Pixel's configuration, which caused Meta to receive Plaintiff's and Class Members' Confidential Medical Information in a manner that was personally identifiable to each individual by name.

106. Expert analysis shows that when Plaintiff and Class Members visited Defendant's website at www.enbrel.com, the Meta Pixel automatically caused the Plaintiff's or the Class Member's personal identifiers, including IP addresses, the _fr, _datr, and _fbp cookies described above, and the Facebook IDs or c_user cookies, to be transmitted to Meta, attached to the fact that Plaintiff or the Class Member had visited the website and information regarding certain webpages visited by the individual and information they selected or inputted on those pages, as described in further detail above.

107. The cookies that were transmitted as a result of the Meta Pixel Defendant installed on its website conveyed Plaintiff's and Class Members' Facebook ID (the c_user cookie) which can be used by Facebook and others to find the user's real name, the specific and unique web browser from which the customer is sending the communication (_datr cookie), and an encrypted combination of the information contained in those two cookies (fr cookie).

108. In addition to the Facebook IDs, the Meta Pixel that Defendant placed on its website also automatically captured and disclosed the IP addresses of Plaintiff and other Class Members to Meta.

109. Expert analysis reveals that, rather than merely transmit the "automatic events" that the Meta Pixel collects and transmits from a website without the website owner or developer being required to add any additional code, Amgen intentionally configured the Meta Pixel on its website in a manner that caused it to track, collect, disclose, and allow for the interception of additional personally identifiable Confidential Medical Information, as described in further detail above.

110. When Plaintiff and Class Members used Defendant's website to obtain a discount card that was needed to save them significant amounts of money on their medication, as well as when they went on Amgen's website for their annual renewal of the discount card, the Meta Pixel on Amgen's website caused the Plaintiff's and Class Member's personal identifiers, including IP addresses, and the fr, and datr cookies, and Facebook IDs, also known as c_user cookies, to be disclosed to Meta along with Confidential Medical Information.

111. Put simply, expert analysis and research confirms that Amgen disclosed to Meta and allowed Meta to intercept Plaintiff's and

Class Members' Confidential Medical Information and their personal identifiers, despite knowing that Meta would (and indeed did) access, scan, and use the information for its own purposes.

112. On information and belief, Amgen disclosed Plaintiff's and Class Members' Confidential Medical Information to Meta in order to permit Amgen to improve its own marketing and advertising. Thus, Amgen exchanged Plaintiff's and Class Members' Confidential Medical Information for its own business purposes. These business purposes include using Plaintiff's' and Class Members' data, including their Confidential Medical Information sent by Amgen to Meta, for advertising purposes and to personalize what appears on Plaintiff's and Class Members' Facebook feeds.

**2. Amgen Disclosed Plaintiff's and Class Member's Confidential Medical Information to Google and Google Double Click in Exchange for Improved Advertising Capabilities**

113. According to the US DOJ, "Google now controls the digital tool that nearly every major website publisher uses to sell ads on their websites (publisher ad server); it controls the dominant advertiser tool that helps millions of large and small advertisers buy ad inventory (advertiser ad network); and it controls the largest advertising exchange (ad exchange), a technology that runs real-time auctions to match buyers and sellers of online advertising."[36]

114. Google is "one of the wealthiest companies on the planet, with

---

[36] Justice Department Sues Google for Monopolizing Digital Advertising Technologies, Jan. 23, 2023, https://www.justice.gov/opa/pr/justice-department-sues-google-monopolizing-digital-advertising-technologies

a market value of $1 trillion and annual revenue exceeding $160 billion."[37] Google's global network business also generated approximately $31.7 billion in revenues in 2021.[38]

115. Expert analysis shows that Defendant installed tracking pixels from Google, including adding trackers that allowed it to participate in the Google Marketing Platform, on its website. Defendant, through the installation of Google tracking pixels on its website, aided and abetted Google in intercepting Plaintiff's and Class Members' Confidential Medical Information.

116. Google discussed its tracking pixels in a 2016 blog where it stated:

> The Google Analytics 360 Suite offers integrations with many third party data providers and platforms. It also plugs right into Google AdWords and DoubleClick Digital Marketing, our core ad technology. That means marketers can turn analytics into action by combining their own data from multiple sources — website data, audience data, and customer data (e.g., CRM) and more — and using it to make ads more relevant for people.[39]

117. On July 24, 2018, Google unified its DoubleClick Advertiser Products and the Google Analytics 360 suite under a single brand called the Google Marketing Platform. Google describes its Marketing Platform as "a unified advertising and analytics platform that enables stronger collaboration for your marketing teams by building on existing

---

[37] *Id.*
[38] *Id.*
[39] Double Click Advertisers Blog, https://doubleclick-advertisers.googleblog.com/2016/03/introducing-google-analytics-360-suite.html

integrations between DoubleClick and the Google Analytics 360 Suite."[40]

118.   Google represented that its Google Marketing Platform could help companies understand their audiences on a "deeper level" by allowing them to "[i]ntegrate and access your data to gain a more complete view of your customers, and connect your data with Google cross-device and intent signals to identify the most valuable audiences."[41]

119.   Google also offers a program called Google Analytics, which initially was called Urchin in 2005, later called Universal Analytics in 2013, called Global Site Tag in 2017, and called Google Analytics in 2020. Universal Analytics is described as a product that "offered new tracking codes for websites and tools that gave more in-depth information about user behavior. . . As users began to use 2-3 devices to navigate the web, a key goal of Universal Analytics was tracking the same user across different devices."[42]

120.   Like the Meta, Google also advised companies that its pixels allow the companies to track and disclose not only standard information, but custom events.   As Google Double Click put it when describing its Marketing Platform, the pixel "allows [companies] to configure a separate tracking activity for each event they would like to track."[43]

121.   Google explains that its offer of personalized advertising and

---

[40] Google Support, Introducing Google Marketing Platform, https://support.google.com/campaignmanager/answer/9015629?hl=en&sjid=3897296297295 48039-NA.
[41] Google Support, Introducing Google Marketing Platform, https://support.google.com/campaignmanager/answer/9015629?hl=en&sjid=3897296297295 48039-NA.
[42] History of Google Analytics, February 23, 2032, https://onward.justia.com/history-of-google-analytics/.
[43] Double Click Digital Marketing Suite, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick.

pixels "is a powerful tool that improves advertising relevance for users and increases ROI for advertisers," and that "it works by employing online user data to target users with more relevant advertising content."[44]

122. Like Meta, Google warns companies that use of its tracking pixels will result in disclosure of collected information to Google, which can include Personally Identifiable Information ["PII"]. Google explains on its Help Center website for companies using Google tracking pixels, "For example, if you're a publisher whose contract prohibits you from passing PII to Google, the URLs of pages on your website that display ads by Google must not include email addresses, because those URLs would be passed to Google in any ad request."[45]

123. Like Meta, Google requires companies that use its tracking pixels to "disclose the use of Google Analytics and how it collects and processes data."[46]

124. Expert analysis shows that Defendant's installation and configuration of the Google tracking tools such as Google Analytics, Google Double Click, and Google's Marketing Platform (collectively "Google tracking pixels") on its website resulted in it disclosing and allowing these third parties to intercept Plaintiff and Class Members' Confidential Medical Information. Google's tracking pixels were installed on the Enbrel SupportPlus initial sign-up pages (as well as every other

---

[44] Personalized Advertising, https://support.google.com/adspolicy/answer/143465#sensitive.
[45] Understanding PII in Google's contracts and policies,
https://support.google.com/analytics/answer/7686480?hl=en&ref_topic=1008008&sjid=1888
227036500695002-NC.
[46] Privacy Disclosures Policy,
https://support.google.com/analytics/answer/7318509?hl=en&ref_topic=1008008&sjid=1888
227036500695002-NC.

page that Plaintiff and Class Members would visit in connection with signing up for the Enbrel Co-Pay Card) and on the re-enrollment pages, and collected and disclosed this confidential information from Plaintiff and Class Members as they were entering that information on Defendant's website upon initial sign up and independently during each annual renewal. In addition, expert analysis confirms that for all of the Confidential Medical Information described in this Third Amended Complaint, Google also received identifiers that it uses to match individuals to their Google accounts. As a result, Google received personally identifiable Confidential Medical Information from Amgen both when patients initially signed up for the Enbrel SupportPlus program/Co-Pay Card as well as during each year they renewed the discount cards.

125. Thus, as expert analysis shows, when Plaintiff and Class Members used Amgen's website, Google's Tracking Pixels on Amgen's website caused the disclosure and interception of Plaintiff's and Class Members' Confidential Medical Information and their personal identifiers, including their specific selected health conditions (such as rheumatoid arthritis) and their successful enrollment for the Enbrel Co-Pay Card, as described in further detail above.

126. Expert analysis also shows that Amgen specifically configured the Google tracking pixels to disclose to Google customized data, including patients' selected health conditions and their successful enrollment for the Enbrel Co-Pay Card, as described in further detail above.

127. As described in further detail above, expert analysis shows that all of the described Confidential Medical Information sent to Google

was sent along with identifiers that Google uses to match Plaintiff and Class Members with their Google accounts. Google accounts typically contain the individual's full name and email address, along with a wealth of other identifying information.

128. Put simply, expert analysis and research shows that Amgen purposefully and knowingly disclosed to Google and aided and abetted and assisted it in intercepting Plaintiff's and Class Members' Confidential Medical Information that Google could directly connect to them personally. The information shared included Plaintiff's and Class Members' respective activities on Defendant's website, including confidential personal and medical information that they shared with Amgen in connection with their application for discount cards and annual renewals of those discount cards, including medical conditions, patient status, and prescription medication information.

129. As already explained in the foregoing, Plaintiff specifically allege that Defendant has shared Plaintiff's personally identifying information and Confidential Medical Information with third parties without Plaintiff or Class Members knowledge or authorization, despite knowing that Google would (and indeed did) access, scan, view, and use the information for its own purposes, as described in further detail above.

130. Defendant unlawfully shared this information without providing notice to Plaintiff or Class Members and without seeking their consent. Defendant also permitted Google to use and profit from the information for its own business purposes. Google accessed, scanned, viewed, and used Plaintiff's and Class Members' data, including their Confidential Medical Information sent by Amgen to Google, for advertising purposes and to personalize users' Google searches.

### 3. Amgen Disclosed Plaintiff's and Class Member's Confidential Medical Information to Additional Third Parties, Including Microsoft, Twitter, LiveRamp, and TradeDesk in Exchange for Improved Advertising Capabilities

131. In addition to the Meta Pixel and the Google Tracking Pixels, Defendant has installed, embedded, or otherwise permitted third-party tracking pixels from, at least, Microsoft, Twitter, LiveRamp, and TradeDesk on its website www.enbrel.com, including on all its Enbrel Co-Pay Card enrollment and re-enrollment pages.

132. Microsoft derives over $12 billion of its annual revenue from targeted advertising, which depends in large part on data that companies like Amgen submit to it about consumers, including Confidential Medical Information. Twitter derives the vast majority of its revenue in the same way.

133. Experts confirm that, like Meta and Google, Microsoft and Twitter use the information that Amgen sends about Plaintiff and Class Members, including their Confidential Medical Information, for advertising purposes and to refine and personalize their own products. In order to do so, they access, scan, and use personally identifiable Confidential Medical Information to build profiles they maintain of Plaintiff and Class Members, which are used for a variety of purposes.

134. Expert analysis and research show that LiveRamp and TradeDesk are companies whose principal business is to create highly detailed profiles of consumers using information—including Plaintiff's and Class Members' Confidential Medical Information—that they gather about consumers from various sources, including from companies like

Defendant who integrate their tracking pixels on their websites. LiveRamp and TradeDesk accessed, scanned, viewed, sorted, and used all information received from Amgen to build profiles of Plaintiff and Class Members. These profiles typically include highly detailed and accurate information including individuals' names, addresses, dates of birth, and email addresses. LiveRamp and TradeDesk use these profiles for a variety of purposes, including selling highly-targeted advertising services and creating products that allow media companies and publishers to learn about their audiences in extreme detail. For example, a web publisher that wanted to learn about the health of its audience may use LiveRamp's or TradeDesk's services to do so.

135. Expert analysis shows that, when Plaintiff and Class Members went through the enrollment process and when they went through the re-enrollment process on Amgen's www.enbrel.com website, Amgen disclosed to LiveRamp, at minimum, the fact that Plaintiff and Class Members signed up for the Enbrel Co-Pay Card.

136. Expert analysis also confirms that all data sent through LiveRamp tracking pixels are personally identifiable. LiveRamp accesses, scans, and uses all data received through the pixels to build profiles that it maintains of individuals that contain a wealth of information, including names, addresses, phone numbers, and email addresses. This includes Plaintiff's and Class Members' personally identifiable Confidential Medical Information.

**Third-Party Companies Viewed, Accessed, Scanned, and Used the Personally Identifiable Confidential Medical Information That Amgen Disclosed**

137. As described above, Amgen disclosed to third-parties,

including Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, the personally-identifiable Confidential Medical Information of Plaintiffs and Class Members. Expert analysis shows that these third-party companies viewed, accessed, scanned, and sorted this personally-identifiable Confidential Medical Information, and then used the information to build highly-detailed and accurate profiles of Plaintiffs and Class Members.

138. Expert analysis shows that the highly-detailed and accurate profiles of Plaintiffs and Class Members are used by the third-party companies for a variety of purposes, including refining their own products (including determining what content to show on Plaintiffs and Class Members' Facebook feeds and Google searches) and selling highly-targeted advertisements to other companies.

139. For example, when Amgen sends information to Meta through the Meta Pixel, Meta sees who the person who interacted with Amgen's Enbrel.com website is, along with all the Confidential Medical Information that Amgen sent about the person. Meta views this information, scans and sorts it, and uses it to build and refine a highly detailed profile it maintains on the person. That profile, and all the information used to build it, is used for a variety of purposes. Meta does not and cannot limit how information is used— as noted above, Meta has an "open borders" system such that once Meta has the information, Meta automatically begins to use it like an ingredient in a "mixture of all kinds of user data" that "flows . .

. everywhere" and that, once mixed, cannot be unmixed.[47]

140. As described above, Doe was able to confirm that Meta viewed, accessed, scanned, sorted, and used information sent to Meta about her in this way by visiting her Facebook activity page, which reported to her that it had accessed information about her that was sent to Meta from the Enbrel.com website on multiple dates.

141. Likewise, when Amgen sends information to Google through the Google tracking pixels it embeds on its Enbrel.com website as described above, Google sees who the person who interacted with Amgen's Enbrel.com website is, along with all the Confidential Medical Information that Amgen sent about the person. Google views this information, scans and sorts it, and uses it to build and refine a highly detailed profile it maintains on the person. That profile, and all the information used to build it, is used for a variety of purposes. Google also uses Artificial Intelligence and machine learning to analyze the information and profiles to enhance Google's products and targeted advertisement services.

142. As described above, Doe was able to confirm that Google viewed, accessed, scanned, sorted, and used information sent to Google about her in this way by visiting her Google activity page, which reported to her that it had accessed information about her that was sent to Google from the Enbrel.com website on multiple dates.

143. As described above, expert analysis also confirmed through test Facebook and Google accounts that at least Meta and Google

---

[47] Vox, This is How Facebook collects data on you even if you don't have an account (April 20, 2018)https://www.vox.com/2018/4/20/17254312/facebook-shadow-profiles-data-collection-non-users-mark-zuckerberg.

received, accessed, scanned, and sorted information sent to Meta and Google by Amgen through the Google and Meta tracking pixels that Amgen embedded on its Enbrel.com website, and that this resulted in an increase in healthcare-related advertisements on the test accounts after interacting with the Enbrel.com website.

## Plaintiff Jane Doe's Experience with Enbrel.com

144.  Plaintiff Jane Doe was diagnosed with ankylosing spondylitis, a type of arthritis, in 2015. The autoimmune disease impacts her eyes, including her vision, plus her hands and other body parts. Among other treatments, she was prescribed Enbrel, which is a once-weekly shot that provides her with substantial relief. Since 2015, she has used Enbrel weekly to maintain her normal function. Without it, her health would seriously deteriorate; she likely would not be able to see.

145.  Soon after being prescribed this treatment, she learned that it was quite expensive and not covered by the insurance she had through her employer. She switched her insurance coverage to a program that would cover it and help lower the cost.  A pharmacist also told her about the Enbrel SupportPlus program/ Enbrel Co-Pay Card that would provide her with additional money to offset the out-of-pocket cost of Enbrel. This pharmacist gave her a brochure so that she could investigate further.

146.    The brochure took her to a website, www.enbrel.com, operated by Amgen, where she could sign-up for the Enbrel SupportPlus program. She first enrolled in the program in approximately 2015 using the Amgen website. At that time, upon information and belief, at a minimum, Google tracking pixels were present on the www.enbrel.com website and were disclosing Confidential Medical Information that was

personally associated with her to unauthorized third parties.

147. Doe enrolled for the Co-Pay Card on www.enbrel.com, a website operated by Amgen, in approximately 2015, using the Google Chrome browser. On information and belief, the Google tracking pixels were active on this webpage at this time. After entering her health information into the website, including her ankylosing spondylitis diagnosis and prescription information, as well her insurance information, she was accepted as an Enbrel SupportPlus member and received a Co-Pay Card under the program. Unbeknownst to her, her Confidential Medical Information, including her ankylosing spondylitis diagnosis, her Enbrel prescription, her insurance information, and her enrollment for the Enbrel Co-Pay Card, was sent to third party companies through tracking pixels that Amgen had embedded on its website and configured to share the information. This included, at minimum, sending the information to Google through the Google tracking pixels.

148. Doe has renewed her membership and Co-Pay Card every year since. She prefers to re-enroll online. Doe recalls re-enrolling online multiple times, including in 2020, 2021, and 2022, using the Google Chrome browser to access the www.enbrel.com website. When renewing her membership, she has signed into her account on the website, entered her date of birth, zip code, and insurance information, confirmed her patient status, and her use of Enbrel. Unbeknownst to her, her personally identifiable Confidential Medical Information, including information relating to her patient status, insurance information, use of Enbrel, and re-enrollment in the Enbrel SupportPlus CoPay card program, was sent to third party companies through tracking pixels that Amgen had

embedded on its website and configured to share the information. This included, at minimum, sending personally identifiable Confidential Medical Information to Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, including information such as the fact that she was submitting a form for ongoing support for Enbrel, had completed the Enbrel Co-Pay Card renewal form, and the type of insurance she had. In addition, this information was personally identifiable, as described in further detail above.

149. These third-party companies accessed Doe's personally identifiable Confidential Medical Information, scanned, viewed, and sorted it, and then used the information to build a highly-detailed and accurate profile of Doe. The third-party companies then used the profiles for a variety of purposes, including selling advertisements and configuring and refining their own products.

150. Doe also recalls that one year she called to complete a portion of the re-enrollment process when her insurance information changed, but believes she still did the bulk of her re-enrollment online that year.

151. Doe has both a Facebook and Gmail account, and has had those accounts for several years, including during the times she has accessed Amgen's website to sign-up for or renew her Co-Pay Card. During all of these online enrollments and re-enrollments, Doe was logged into both Google and Facebook. She uses both her Facebook and Google accounts frequently throughout the day, including for work purposes, and regularly remains logged into those accounts including when she re-rolls. Thus, all of the described Confidential Medical Information sent to Google and Meta due to Amgen's use and configuration of the tracking pixels was sent along with identifiers used

by Google and Meta to match Doe to her Google and Facebook accounts.

152. After signing up and renewing her request for an Enbrel Co-Pay Card on Amgen's website, Doe received internet advertisements for Enbrel, as well as advertisements for other products related to healthcare and insurance.

153. Through no fault or lack of diligence, Doe did not discover that Amgen had disclosed her private information, including her Confidential Medical Information, to unauthorized third parties, including Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, until approximately early 2023, when she contacted Plaintiff's counsel in this case.

154. Defendant did not disclose to Plaintiff or Class Members that it was using third-party tracking pixels to disclose their Confidential Medical Information to unauthorized third parties, and Doe had no reasonable means of discovering this unauthorized disclosure.

## Plaintiff and Class Members are Harmed by Amgen's Disclosure of Private Medical Information

155. It is well-established that there is an economic market for consumers' personal data, including the Confidential Medical Information that was disclosed by Amgen to Meta, Google, and other unauthorized third parties.

156. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender, and location" information are sold for about "$0.50 per 1,000 people." Emily Steel, et al., *How much is your personal data worth?*, FIN. TIMES (June 12, 2013), https://ig.ft.com/how-much-is-your-personal-data-

worth/#axzz3myQiwm6u. This estimate was based upon "industry pricing data viewed by the Financial Times," at the time. *Id.*

157.  In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30 per name." Pauline Glickman and Nicholas Glady, *What's the Value of Your Data?*, TECHCRUNCH (Oct. 13, 2015), https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.  That same report noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data (within the corporate acquisition context) can vary from $15 to more than $40 per user.

158.  In 2021, a report from *Invisibly* found that personal medical information is one of the *most valuable pieces of data* within the data-market. "It's worth acknowledging that because health care records often feature a more complete collection of the patient's identity, background, and personal identifying information (PII), health care records have proven to be of particular value for data thieves. While a single social security number might go for $0.53, a complete health care records sells for $250 on average. For criminals, the more complete a dataset, the more potential value they can get out of it. As a result, health care breaches increased by 55% in 2020." *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY.COM (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/.

159. Moreover, health information has value to consumers. According to the annual Financial Trust Index Survey, conducted by the University of Chicago's Booth School of Business and Northwestern

University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey respondents would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000. Andrea Park, *How much should health data cost? $100K or more, according to patients*, Becker's Hosp. Rev. (Feb. 12, 2020), https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html.

160. Given the existence of a market for the medical information disclosed by Defendant, Defendant has deprived Plaintiff and Class Members of the economic value of their Confidential Medical Information by disclosing such data without authorization and without providing proper consideration for Plaintiff's and other Class Members' property.

161. On information and belief, Defendant has profited from its practice of disclosing Plaintiff and Class Members' Confidential Medical Information to, and allowing for the interception of that Information by, third parties like Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk in exchange for improved marketing capabilities. Amgen realized they could make money from improving their marketing capabilities, but rather than paying for a service, Defendant chose to give Plaintiff and Class Members' valuable confidential data to Meta, Google, and other Advertising Tracking Companies in exchange for the use of their tracking software.

## Tolling, Concealment, and Estoppel

162. Any applicable statutes of limitation have been tolled by

Defendant's knowing and active concealment of its incorporation of the third-party tracking pixels into its website.

163. The third-party tracking pixels on Defendant's website were and are entirely invisible to a website visitor.

164. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

165. Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

166. Defendant had exclusive knowledge that its website incorporated the third-party tracking pixels and yet failed to disclose to customers, including Plaintiff and Class Members, that as a result of using Defendant's website, Plaintiff's and Class Members' Confidential Medical Information would be disclosed or released to, at least, Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk. In addition, Defendant's use of the pixels was illegal and counter to promises made by Defendant to Plaintiff and Class Members regarding the protection of their data from third parties.

167. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' medical information. Accordingly, Defendant is estopped from relying on any statute of limitations.

168. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

169. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## Class Action Allegations

170. Plaintiff brings this action, on behalf of herself and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) and/or 23(b)(2).

171. Plaintiff proposes to certify the following class:

**The California Class:** All natural persons residing in California who used Defendant's website, www.enbrel.com, and provided Defendant with Confidential Medical Information that was disclosed or transmitted to Meta, Google, or any other unauthorized third party; and

172. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel. Plaintiff reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

173. The class easily satisfies the requirements under Rule 23 for the certification of a class action, known respectively as numerosity, commonality, typicality, adequacy, predominance, and superiority. Although ascertainability is not a separate requirement of class actions, this class is in fact easily ascertainable.

174. First, Enbrel is used by hundreds of thousands of patients, many thousands of whom provided Amgen with their Confidential Medical Information through the Enbrel.com website. Numerosity is beyond dispute here.

175. Second, common questions of fact and law abound in this matter, including, but not limited to, whether Amgen acted with scienter

in this matter and whether the information send to third-party companies was "personally identifiable."

176. Third, Plaintiff's claims are typical of those of the class members: Plaintiff, residing in California, used Defendant's website to sign-up for an Enbrel Co-Pay Card, and then to re-enroll each year to keep the card. In the process, she disclosed her personal medical information at a time when the Amgen website maintained third-party tracking pixels to share information with third parties, which mirrors the circumstances of all Class Members.

177. Fourth, Plaintiff will adequately represent the class in this matter because she has no known conflicts of interest with other class members, because her claims are typical of those of the class, and because she will vigorously and diligently prosecute this matter. Plaintiff's choice of class counsel, HammondLaw P.C. and Gerstein Harrow LLP, are all experienced class action practitioners who will adequately protect the interests of absent class members.

178. Fifth, common questions vastly predominate over individual ones in this matter. All class members suffered the exact same privacy violation, and so liability will be determined for each on a wholly class wide basis.

179. Sixth, a class action is a superior way—indeed the only practical way—to proceed in this matter. There are thousands of patients who use Enbrel and have submitted their personal information to Amgen through the website www.enbrel.com, each with identical claims, and there are no practical obstacles to noticing them, determining whether Amgen violated their privacy rights, and proceeding on their behalf as a

class. Forcing each to proceed individually, on the other hand, would be impractical and a severe waste of judicial resources.

180. Finally, although this is not a standalone requirement, this class is easily ascertainable. Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk maintain records by which they can easily identify which of their users and other tracked individuals used the Enbrel.com website. Through the service of straightforward subpoenas for records, Plaintiff will be able to ascertain the name, tracked contact information, Facebook profile, and Google account and Gmail address, Microsoft account and email address, Twitter account, and other email addresses of each and every member of the class and, therefore, will be able easily to notice them of this action, especially using electronic means of notice.

## Claims for Relief

### Count One: Common Law Invasion of Privacy – Intrusion into Private Matters (On Behalf of Plaintiff and the California Class)

181. Plaintiff incorporates all prior paragraphs by reference.

182. Amgen's secret disclosure of Plaintiff's and other California Class Members' personal information and private medical information, including information about their medical conditions, prescriptions, and treatments (collectively, their Confidential Medical Information), constitutes an intentional intrusion upon Plaintiff's and California Class Members' private matters that were intended to stay private from third parties.

183. Plaintiff and California Class Members had a reasonable expectation of privacy in their Confidential Medical Information. Plaintiff and California Class Members did not consent to, authorize, or have any reason to know about Defendant's intrusion into their privacy

at the time it occurred.

184. Defendant's intrusion into Plaintiff's and California Class Members' private affairs, seclusion, and solitude, would be highly offensive to a reasonable person and was highly offensive to Plaintiff. Plaintiff and California Class Members reasonably expected that the private medical information they shared, including specific information that they were taking prescription medication for a specific medical condition, would not be disclosed to an unauthorized third party. Social norms and industry standards inform the understanding that medical information is highly protected and that disclosure of that information to third parties requires consent and authorization. The secret disclosure of Confidential Medical Information would be highly offensive to a reasonable person.

185. Plaintiff and California Class Members have been harmed as a result of Defendant's actions, including by, but not limited to, an invasion of their privacy rights.

186. Plaintiff and California Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Defendant as a result of its intrusions into Plaintiff's and California Class Members' private matters.

187. Plaintiff and California Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions which were directed at invading Plaintiff's and California Class Members' privacy rights in conscious disregard of those rights. Such damages are necessary to deter Amgen from engaging in such conduct in the future.

188. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stakes in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

189. Plaintiff, on behalf of herself and the California Class, requests relief as further described below.

### *Count Two: Invasion of Privacy and Violation of California Constitution, Art. 1, § 1 (On Behalf of Plaintiff and the California Class)*

190. Plaintiff incorporates all prior paragraphs by reference.

191. The right to privacy is enshrined in the California Constitution. Article 1, Section 1, provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

192. Plaintiff and Class Members did not consent to or authorize Defendant to disclose their Confidential Medical Information to unauthorized third parties. Indeed, Plaintiff and Class Members had no knowledge that such information was being so disclosed and, consequently, had no opportunity to deny consent or authorization.

193. Plaintiff and California Class Members had a reasonable expectation of privacy in their personal information, identities, and

medical information pursuant to Article 1, Section 1, of the California Constitution, social norms, and the expectations of privacy that attach to communications regarding healthcare.

194. Defendant's disclosure of Plaintiff and California Class Members' Confidential Medical Information constitutes an intentional invasion of private communications, information, and matters, and an egregious breach of social norms.

195. Defendant's conduct was highly offensive to Plaintiff and would be highly offensive to a reasonable person because the data disclosed was highly sensitive and personal, as protected by the California Constitution, and Defendant lacked consent or authorization to disclose such information to third parties.

196. Defendant's violation of the privacy rights of thousands of California Class Members, including Plaintiff, without authorization or consent, constitutes an egregious breach of social norms.

197. Plaintiff and California Class Members have sustained damages and will continue to suffer damages as a result of Defendant's invasion of their privacy.

198. Plaintiff and California Class Members seek appropriate relief for their injuries, including, but not limited to, monetary damages to compensate for the harm to their privacy interests and disgorgement of profits made by Defendant as a result of its intrusions into Plaintiff and California Class Members' private matters.

199. Plaintiff and California Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which were directed at invading Plaintiff's and California Class Members' privacy rights in conscious disregard of

those rights. Such damages are necessary to deter Defendant from engaging in such conduct in the future.

200. Plaintiff and California Class Members have also suffered irreparable injury from these unauthorized acts of disclosure. Their personal, private, and sensitive medical information has been collected, viewed, accessed, stored, and used by Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk and has not been destroyed. Due to the continuing threat of such injury, Plaintiff and California Class Members have no adequate remedy at law and are entitled to injunctive relief. Plaintiff and California Class Members seek a permanent injunction enjoining Defendant from engaging in further conduct in violation of Article 1, Section 1 of the California Constitution.

201. This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on a large class of persons and/or the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purposes of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs in prosecuting this action against Defendant under Code of Civil Procedure § 1021.5 and other applicable law.

202. Plaintiff, on behalf of herself and the California Class, seeks relief as further described below.

### *Count Three: Violation of California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101*
### *(On Behalf of Plaintiff and the California Class)*

203. Plaintiff incorporates all prior paragraphs by reference.

204.  Cal. Civ. Code § 56.101(a), the California Confidentiality of Medical Information Act (CMIA) requires that every pharmaceutical company that "creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

205.  Section 56.101(a) of CMIA further provides, in pertinent part, that any pharmaceutical company that "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

206.  Amgen is, and all relevant times has been, a "pharmaceutical company" that creates, maintains preserves, or stores medical information within the meaning of §§ 56.101(a) and 56.05(m).

207. Plaintiff and California Class Members are "patients" as defined by Cal. Civ. Code § 56.05(l).

208.  Defendant failed to maintain, preserve, and store Plaintiff's and Class Members' medical information in a manner that preserves the confidentiality of the information contained therein because Defendant disclosed to, at least, Meta, Google, Microsoft, Twitter, LiveRamp, and TradeDesk, Plaintiff's and Class Members' Confidential Medical Information, as defined and described in this Complaint, including their identities, health conditions, and prescriptions. Instead, Defendant unlawfully disclosed Plaintiff's and Class Members' Confidential Medical Information to these third-party companies in a manner that was fully viewable, usable, and accessible by these companies, including providing information sufficient to disclose Plaintiff's and Class Members' efforts

to use Enbrel to treat a medical condition in a way that allowed for third parties to identify those individuals, something that was highly offensive to Plaintiff.

209. These third-party companies accessed Plaintiff's and Class Members' personally identifiable Confidential Medical Information, scanned, viewed, and sorted it, and then used it to build highly-detailed and accurate profiles of Doe and Class Members. The third-party companies then used the profiles and the Confidential Medical Information in the profiles to sell highly targeted advertisements and to refine and configure their own products.

210. As set forth more fully above, Jane Doe and Class Members' Confidential Medical Information, along with their personal identifiers, was unlawfully shared by Defendant with third parties including Meta, Google, and others who then viewed, accessed, scanned, sorted, and used that information for their own benefit and purpose. This viewing and use by these third parties is confirmed by: (1) Jane Doe's receipt of targeted ads related to Enbrel following her use of the website (*see* ¶ 152); (2) Doe's own Facebook and Google accounts' activity pages which confirm that each of Meta and Google received, viewed, accessed, and used information about her from Enbrel.com (*see* ¶¶ 60–64); (3) expert analysis and testing showing an increase in targeted healthcare-related advertisements after utilizing the Enbrel.com website (*see* ¶¶ 56–68); (4) expert analysis and testing showing that test accounts' Google and Facebook activity pages confirm that Meta and Google received, viewed, accessed, and used information sent to Meta and Google by Amgen about the test accounts' visits to the Enbrel.com website (*see* ¶¶ 54–55); (5) expert analysis and research on the manner in which the third-party

companies use information sent through their pixels from companies like Amgen (*see* ¶¶ 5, 111, 128, 133–136, 138); (6) the business models of each of the third-party companies and the profits they make by relying on information gathered through their pixels to sell highly-targeted advertisements (*see* ¶¶ 67–70, 113–114, 132, 134); and (7) Meta and Google's own disclosures that confirm the manner in which they automatically utilize information provided to them via pixels from third parties (including disclosures warning companies like Amgen not to use their tracking pixels in a manner that would reveal sensitive information, as well as documents showing that Meta and Google automatically access, scan, and match such information to highly-detailed profiles of individuals and then use Artificial Intelligence and machine learning to analyze the information and profiles in order to enhance their own products and advertising, and that at least Meta cannot limit the ways in which the information is used because the information is automatically incorporated into a "mixture of all kinds of user data" that "flows . . . everywhere" and that, once mixed, cannot be unmixed[48]) (*see* ¶¶ 93–95, 122, 139, 141).

211. Defendant's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at a minimum, negligent, and violates Civil Code § 56.101(a).

212. Accordingly, pursuant to Cal. Civil Code § 56.36,

---

[48] Vox, This is How Facebook collects data on you even if you don't have an account (April 20, 2018)https://www.vox.com/2018/4/20/17254312/facebook-shadow-profiles-data-collection-non-users-mark-zuckerberg.

Plaintiff and California Class Members are entitled to: (1) nominal damages of one thousand dollars ($1,000); (2) actual damages, in an amount to be determined at trial; and (3) statutory damages pursuant to Civil Code § 56.36(c); and (4) reasonable attorneys' fees and the costs of litigation.

213. Plaintiff, on behalf of herself and the California Class, seeks relief as further described below.

## **Prayer for Relief**

Plaintiff Jane Doe, on behalf of herself and all Class Members, respectfully request judgment against Defendant as follows:

- Ordering that this action may proceed and be maintained as a class action under Federal Rule 23(b)(3) and/or (b)(2); and defining the Class as specified above and appointing Plaintiff as a Representative of the Class and her attorneys as Counsel for the Class;

- Awarding Plaintiff and California Class Members injunctive relief, compensatory damages, disgorgement of profits, and punitive damages for Defendant's invasion of privacy and violation of Article 1, Section 1 of the California Constitution;

- Awarding Plaintiff and California Class Members nominal damages of $1,000 per violation, or actual damages, and reasonable attorneys' fees and the costs of litigation, for Defendant's violations of California's Confidentiality of Medical Information Act, Cal. Civil Code §§ 56.36, 56.101;

- Awarding attorneys' fees and costs as authorized by statute and governing law, including Code of Civil Procedure § 1021.5;

- Awarding pre- and post-judgment interest as provided by law; and

- Awarding such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

Further, on behalf of herself and other members of the Class, Plaintiff hereby demands a jury trial on all issues so triable.

Dated: Jun 20, 2024     Respectfully submitted,

           */s/ Julian Hammond*
           Julian Hammond (SBN 268489)
           jhammond@hammondlawpc.com
           Christina Tusan(SBN 192203)
           ctusan@hammondlawpc.com
           Adrian Barnes (SBN 253131)
           abarnes@hammondlawpc.com
           Ari Cherniak (SBN 290071)
           acherniak@hammondlawpc.com
           Polina Brandler (SBN 269086)
           pbrandler@hammondlawpc.com
           HAMMONDLAW, P.C.
           1201 Pacific Ave, 6th Floor
           Tacoma, WA 98402
           (310) 807-1666

           */s/ Jason Harrow*
           Jason Harrow
           (Cal. Bar No. 308560)
           GERSTEIN HARROW LLP
           12100 Wilshire Blvd. Ste. 800
           Los Angeles, CA 90016
           jason@gerstein-harrow.com
           (323) 744-5293(323) 744-5293
           Emily Gerrick
           (*pro hac vice*)

GERSTEIN HARROW LLP
1001 G Street NW, Ste. 400E
Washington, DC 20001
emily@gerstein-harrow.com
(202) 670-4809

*Attorneys for Plaintiff*